COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-217-CV

IN THE MATTER OF THE GUARDIANSHIP 

OF VIRGIE LOUISE PARKER, 

AN ALLEGED INCAPACITATED PERSON

------------

FROM PROBATE COURT NO. 1 OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I.  Introduction

In four issues, Appellant, the attorney ad litem for Virgie Louise Parker, asserts that the trial court erred by admitting at trial two physician’s reports and argues that the evidence presented at trial was legally and factually insufficient to support the jury’s findings that Parker was incapacitated, that it was in her interest for a guardian to be appointed, and that her rights would be protected by such an appointment.  We will affirm.

II. History

A.  Background
 
and Documentation

On August 22, 2005, Tanika East, 
an Adult Protection Services caseworker, went to the home of Parker, age 74, after a report of alleged physical harm.  Parker was living alone at a home previously owned by her deceased husband.  
Parker’s house was locked, and Parker refused to allow East to enter her home.  East observed the outside of Parker’s home to be in a state of disrepair; the yard was cluttered with debris, including three junk vans, and makeshift plywood was up against the house; a dog shed was in the front yard with a dog inside; and there was a tent in the yard where Parker was reported to be living.
  In addition, East observed that Parker was wearing dirty clothes, her hands were dirty, her hair was not clean, and she appeared to have been digging in the dirt.  During her investigation, East spoke with Parker’s neighbors and received reports that Parker was living in the backyard and roaming the neighborhood collecting trash.

After the visit, East determined that Parker was at risk for physical neglect and that she should be removed from her home, so East initiated a guardianship proceeding based upon her observations and her conversations with Parker and Parker’s neighbors.  On August 25, 2005, East returned and observed Parker in the same physical appearance as the first time that she saw her.  During East’s visits to Parker’s home, Parker did not wish to speak with East and refused to provide any information during either of her visits.  East took pictures of Parker’s physical condition, as well as the appearance of the outside of the home.  These photos of the home were introduced at trial and are in the record, verifying that extremely cluttered conditions existed at the home.  If anything, the pictures show that East’s descriptions were understating the conditions found at the home.  Adult Protective Services then removed Parker from her home and placed her in a nursing facility at Park View Care Center (“Park View”) in Fort Worth.  
After the two August meetings with Parker, East had no further contact with Parker until her trial in February 2006.  East testified that she had investigated over one hundred cases and that she had filed only two or three cases reporting the need for guardianship, of which this case was one.

Park View offered medical records into evidence under the “Notice of Filing of Records Accompanied by Affidavit Under Rule 902(10).”  These records contained numerous notes by the physicians, nurses, and caseworkers as to Parker’s condition.  Documentation from her stay at Park View was extensive and included the following partial assessments/diagnoses:  several “diagnosis of Dementia and or Alzheimers disease”; multiple assessments that Parker “requires continued facility level of care on a daily inpatient basis”; and several assessments of “depression . . . unable to care for herself . . . constant one-to-one assistance . . . confused and disoriented . . . episodes of disorientation or forgetfulness requiring staff intervention one to six times per week.”  According to one “progress report,” Parker stated to the nurse, “I don’t go to the doctors or have a regular doctor because of lack of money,” and she “refused to sign her admission . . . and to give any information for her social history . . . [and] feels as if she is being held prisoner.”  According to another “progress report,” Parker goes on to 

allege to her Dr. that we are keeping [her] here at [Park View] against her will.  Dr. attempted to explain to [Parker] that [she] currently has a temporary Guardian through the State. [Parker] remains very upset and told Dr. that all of the nurses at [Park View] lied on the paperwork that was presented to the judge. [Parker] alleged to Dr. that [Park View] is destroying her finances and giving [a] bad report on her.

The nursing facility history and physical form taken on September 2, 2005, and signed by Dr. Adolphus Ray Lewis, D.O. 
had boxes checked for delusion, agitation, chronic obstructive pulmonary disease (“
COPD”), depression, Alzheimer’s, or Alzh/dementia, with Aricept being mentioned as one of the medications ordered.  On September 30, 2005, Parker’s Aricept medication increased from five milligrams to ten milligrams, as it was determined that the maximum dose would be beneficial, and the drug Nameda was added to the regimen on September 30, 2005.  Progress notes on December 12, 2005, reflected that Parker was disoriented, had delusions, and was still being treated for depression and dementia and COPD.  On the progress notes dated August 26, 2005, it stated that “patient answers all quest[ion]s but cannot process well.”  It also stated that “[patient] responded to some questions with short answers in covering up pt-c early dementia and psyche eval[ation].”  The nurses’ notes contained examples of Parker’s requiring daily intervention by the staff and having to be reminded of meal times.

A Physician’s Certificate of Medical Exam was prepared, and Dr. Lewis, signed the report after the evaluation of Parker.  Filed in the trial court on August 29, 2005, Dr. Lewis’s Physician’s Certification of Medical Exam (“Report No. One”) found Parker to be totally incapacitated.  The report stated that Parker “[was] unable to make decisions and care for herself . . . . Assessment revealed early dementia.”

On August 30, 2005, the guardian ad litem for Parker, Kelcie Hibbs, filed an “Application for Appointment of Any Suitable Person as Temporary and Permanent Guardian of the Person” for Parker.  On August 31, 2005, Parker filed her original answer contesting the guardianship proceedings filed against her.

On September 7, 2005, Parker’s attorney ad litem requested an independent medical examination.  On September 19, the court signed an agreed order, ordered the exam, and appointed Dr. Edward A. Luke, Jr. to conduct the exam.  The court then appointed the Texas Department of Aging and Disability Services as temporary guardian of Parker pending her contest of the permanent guardianship.  On October 12, 2005, Dr. Luke 
met with Parker for approximately thirty minutes to an hour, reviewed the medical chart, and interviewed her nurse at Park View.  After examining Parker, Dr. Luke determined that she was totally incapacitated.  On November 22, 2005, Dr. Luke completed his report (“Report No. Two”) and filed it with the court on November 29, 2005.  Dr. Luke stated in his report the following:

Parker’s remote memory is impaired.  She believes she was remarried to her ex-husband.  Her recent memory is also impaired.  She does not accurately remember the recent events concerning what had happened at the house where she lived, nor what had transpired when she was admitted at the Parkview Care Center.  She can not remember what her current medications were and when she referred to a note book she was still not able to give an accurate list.

B.  Trial Testimony

Dominica Ihegboro, a guardianship specialist, served as the representative for Texas Department of Aging and Disability Services as the temporary guardian of the person of Parker.  Ihegboro testified that, in her visits with Parker, Parker was unable to care for herself
, make decisions, and meet her daily needs;
 Parker’s house was unlivable and not hooked up to facilities; and Parker was unable of making the appropriate housing arrangements for herself.  Parker
 was unable to manage her finances
 to rectify her home situation
 and was unable to go to the store to buy food and prepare it.
  Ihegboro also testifed that Parker’s doctor had indicated that Parker had not been receiving enough nutrition.  
Parker exhibited memory problems and was taking Namenda, Nematine, and memory medication for her dementia
, although Parker had not cooperated or provided information to her doctors and did not remember what medications she was taking.

Parker testified that the pictures taken by East were of her, the outside of her van, and her property.  Parker said that she had previously been cited by Code Enforcement for the condition of the house.  
She further testified that she walked or rode the bus because she could not afford to drive a car and 
had not driven since probably 2005.  Nevertheless, Parker then testified that after she got back home, she was going to get “that nice old van they took a picture of out[,] and I’m going to drive it.”  
She also stated that she had not written a check in at least two years.  Parker testified that she did not think she needed to be taking any kind of medication but was not clear about how many times a day she took her medications.  Parker’s plan for where she would live if released from Park View was to live with a friend, but she did not have any idea of the amount of the rent.  Parker also could not answer questions about how much her groceries cost a month or how much she would spend.  Parker also stated that Dr. Luke changed his report from a partial incapacitation block to total.  Dr. Luke’s Certificate of Medical Exam had no cross-outs or strike-overs, and Parker refused to believe it.

Barbara Carrington, a friend of Parker’s, testified that prior to visiting Parker in the nursing home in August 2005, the last time she went to Parker’s home was in 2004.  Carrington testified that the last time she saw Parker’s residence in 2004, it was kind of dark, and she did not know whether or not there was clutter in the yard.  Unaware that Parker had been diagnosed with dementia
, Carrington testified, in her opinion, that Parker did not need any type of medication. 

After a trial on the merits, the jury found that Parker was an incapacitated person.  Furthermore, the jury found that it was in the best interest of Parker to have the trial court appoint a guardian, and that she would be protected by such an appointment.  Parker filed a motion for new trial, which was overruled.  This appeal followed.

III.  The Physician’s Reports

In her first issue, Parker argues that the reports of Dr. Adolphus Lewis and Dr. Edward Luke were inadmissible and should not have been admitted at trial under Texas Rule of Evidence 803(6).  

A.  Standard of Review

An appellate court must examine a probate court’s appointment of a guardian, as well as the challenges to the admission or exclusion of evidence, for an abuse of discretion.  
Nat’l Liab. & Fire Ins. Co. v. Allen
, 15 S.W.3d 525, 527-28 (Tex. 2000); 
Trimble v. Tex. Dep’t of Prot. & Reg. Serv.
, 981 S.W.2d 211, 217 (Tex. App.—Houston [14th Dist.] 1998, no pet.).

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable.  
Downer v. Aquamarine Operators, Inc.
, 701 S.W.2d 238, 241-42 (Tex. 1985), 
cert. denied
, 476 U.S. 1159 (1986).  Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred.  
Id
.

An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence.  
In re Barber
, 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding).  Furthermore, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court’s decision.  
Butnaru v. Ford Motor Co.
, 84 S.W.3d 198, 211 (Tex. 2002).

B.  Analysis

Texas Rule of Evidence 803(6) reads as follows:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness.

. . . .

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and 
if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation
, all as shown by the testimony of the custodian or other qualified witness, or by affidavit that complies with Rule 902(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Tex. R. Evid
. 803(6) (emphasis added).  

Parker asserts that the physician’s reports from Dr. Luke and Dr. Lewis should not have been admitted under the business records exception to the hearsay rule because the reports were not made, she argues, in the regular practice of their business and cites as authority
 Texas Employer’s Insurance Ass’n v. Sauceda
, 636 S.W.2d 494 (Tex. App.—San Antonio 1982, no writ), and 
Freeman v. American Motorists Insurance Co.
, 53 S.W.3d 710 (Tex. App.—Houston [1st Dist.] 2001, no pet.).  These cases are distinguishable.  In 
Sauceda
, wherein Frutoso Sauceda sued under a worker’s compensation claim, TEIA, the carrier, offered a one page letter “report” from a physician without supporting documents that appeared to be made in response to a request from TEIA concerning “critical issues surrounding the instant controversy.” 
 Sauceda
, 636 S.W.2d at 498.  The court questioned the 
trustworthiness
 of the document, which is the foundation of the business records exception,
(footnote: 2) because on its face it appears to have been elicited by an outside 
interested
 source, and further, was sent four months after the last examination of the patient was made.  

In 
Freeman
, wherein Stanley Freeman sued AMIC under a worker’s compensation claim, the document in question was a one-page letter from Dr. Sajadi to Freeman’s attorney, apparently without supporting documentation.  Referring to the reasoning in 
Sauceda
, the court noted that the letter was written ten years after the cause of action accrued and 

a mere 10 days before the summary judgment hearing.  This time frame indicates a 
lack of trustworthiness
.  In the absence of Dr. Sajadi’s remaining records, it appears that he wrote the letter solely in response to a request from Freeman’s attorney . . . [and] is an attempt to convey an opinion which has been elicited by an outside interested source.

Freeman
, 53 S.W.3d at 715 (emphasis supplied).  Both documents from the two cases were found to be inadmissible by the appellate courts, who focused on the trustworthiness of the documents solicited by a party with a pecuniary interest in the outcome of the case.

In the case before the court, the reports in question were prepared by Dr. Lewis on August 26, 2005, and by Dr. Luke on November 22, 2005, with an undated addendum attached to Dr. Luke’s report based on the same examination as his report.  The affadivits accompanying the reports tracked the language of Rule 803(6) indicating that it was the regular course of business to make the reports.  These reports were not requested by an interested party having a pecuniary interest in the case, as in 
Freeman
 and 
Sauceda
, and in fact, Dr. Luke’s examination and subsequent report and addendum were the result of an agreed order dated September 19, 2005, and signed by Parker’s attorney.  Under these circumstances, we cannot say that there is a question about trustworthiness, which is the basis for the business reports exception, and hold that the trial court, under the appropriate standard of review, did not abuse its discretion by admitting the reports.  We also observe, as will be discussed in the legal and factual sufficiency review that follows, that much of the information contained in the report is also contained in the records from Park View’s records, which were properly admitted into evidence.  We overrule Parker’s first issue.

IV.  Legal and Factual Sufficiency

In her final three issues, Parker asserts that the evidence is legally and factually insufficient to support the jury’s findings that Parker was incapacitated, that it was in her interest for a guardian to be appointed, and that her rights will be protected by such an appointment.

The jury answered certain questions in the court’s charge that had as the measure proof or a clear and convincing evidence standard (incapacity, best interest for appointment of guardian, protected by appointment of guardian).   
Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.  
Tex. Civ. Prac. & Rem. Code Ann. 
§ 41.001(2) (Vernon Supp. 2006
); Tex. Fam. Code Ann.
 § 101.007 (Vernon 2002); 
Transp. Ins. Co. v. Moriel
, 879 S.W.2d 10, 31 (Tex. 1994).  This intermediate standard falls between the preponderance standard of civil proceedings and the reasonable doubt standard of criminal proceedings.  
In re G.M.
, 596 S.W.2d 846, 847 (Tex. 1980); 
State v. Addington
, 588 S.W.2d 569, 570 (Tex. 1979).  While the proof must weigh heavier than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed.  
Addington
, 588 S.W.2d at 570.

This higher burden of proof elevates the appellate standard of legal sufficiency review.  
Diamond Shamrock Ref. Co. v. Hall
, 168 S.W.3d 164, 170 (Tex. 2005); 
Sw.
 
Bell Tel. Co. v. Garza
, 164 S.W.3d 607, 622, 625 (Tex. 2004).  In reviewing the evidence for legal sufficiency, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true.  
Hall
, 168 S.W.3d at 170; 
Garza
, 164 S.W.3d at 627.  We must review all the evidence in the light most favorable to the finding.  
Hall
, 168 S.W.3d at 170;
 Garza
, 164 S.W.3d at 627.  This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so.  
Hall
, 168 S.W.3d at 170; 
Garza
, 164 S.W.3d at 627.  We must also disregard all evidence that a reasonable factfinder could have disbelieved.  
Hall
, 168 S.W.3d at 170; 
Garza
, 164 S.W.3d at 627.  We must consider, however, undisputed evidence even if it is contrary to the finding.  
City of Keller v. Wilson
, 168 S.W.3d 802, 817 (Tex. 2005); 
Hall
, 168 S.W.3d at 170.  That is, we must consider evidence favorable to the finding if a reasonable factfinder could, and disregard evidence contrary to the finding unless a reasonable factfinder could not.  
Wilson
, 168 S.W.3d at 827.

This higher burden of proof also elevates the appellate standard of factual sufficiency review.  
In re C.H.
, 89 S.W.3d 17, 25 (Tex. 2002).  On appeal, we cannot view a finding that must be based on clear and convincing evidence the same as one that may be sustained on a mere preponderance.  
Id.
  In considering whether the evidence rises to the level of being clear and convincing, we must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that its finding was true.  
Id. 
at 28.

The distinction between legal and factual sufficiency lies in how we review the evidence.  
In reJ.F.C.
, 96 S.W.3d 256, 266 (Tex. 2002).  In a factual sufficiency review, in determining whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true, we must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding.  
Id.
  If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.  
Id.
  If we reverse on factual sufficiency grounds, then we must detail in our opinion why we have concluded that a reasonable factfinder could not have credited disputed evidence in favor of its finding.  
Id. 
at 266-67.

Based on the appropriate standard of review, and the evidence recounted herein, we hold that the evidence presented at trial was such that the jury could reasonably form a firm belief or conviction that Parker was an incapacitated person, that it was in her best interest to have a guardian appointed, and that she would be protected by such an appointment, and therefore hold that the jury’s verdict on these issues was supported by legally and factually sufficient evidence.  We overrule Parker’s second, third, and fourth issues.

V.  Conclusion

Having overruled Parker’s four issues, we affirm the judgment of the trial court.

BOB MCCOY

JUSTICE

PANEL A: HOLMAN, GARDNER, and MCCOY, JJ.

DELIVERED: November 29, 2007

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
“This exception rests upon a circumstantial guarantee of trustworthiness . . . .” 
 Id.