IN THE SUPREME COURT OF TEXAS













IN THE SUPREME COURT OF TEXAS

 

════════════

No. 04-0575

════════════

 

Columbia Medical
Center of Las Colinas, Inc. d/b/a Las Colinas Medical Center,
Petitioner,

 

v.

 

Athena Hogue, Individually and
as Executrix of the Estate of Robert Hogue, Jr., Deceased, Christopher Hogue,
and Robert Hogue, III, Respondents

 

════════════════════════════════════════════════════

On Petition for Review from the

Court of Appeals for the Fifth District of Texas

════════════════════════════════════════════════════

 

 

Argued April 12,
2005

 

 

            Justice Green, joined by Justice Hecht, concurring in part and
dissenting in part.

 

 

            I respectfully dissent to the part
of the Court’s judgment sustaining the gross negligence damages. I join in the
remainder of the judgment.

            The standard for establishing gross
negligence sets a very high bar for claimants to overcome. And it should. Gross
negligence equates to outrageous conduct for which severe punishment is
justified. And because it is punitive in nature, the evidence of gross
negligence must be clear and convincing before punitive damages are
recoverable. See Tex. Civ. Prac.
& Rem. Code § 41.003(a)(3); Sw. Bell Tel. Co. v. Garza, 164
S.W.3d 607, 627 (Tex.
2004). This elevated clear and convincing standard, to have any meaning, must
necessarily affect legal sufficiency review. It is not enough to simply
conclude, as the Court does, that there is some evidence to support the jury’s
gross negligence finding without determining whether that evidence is clear and
convincing. We have explained this legal sufficiency review at length,
recognizing that “a finding that must meet an elevated standard of proof must
also meet an elevated standard of review.” Sw. Bell Tel. Co., 164 S.W.3d
at 622. Even if an appellate court determines that the supporting evidence
amounts to more than a scintilla, “the finding is invalid unless the evidence
is also clear and convincing.” Id.
at 621.

            Although the Court recites the
correct standard for gross negligence, ___ S.W.3d at ___, it does not apply
that standard but instead uses some lesser standard when evaluating the
evidence. See id. at ___ (stating that there is “sufficient evidence to
support the jury’s conclusion”). But see Transp. Ins. Co. v. Moriel, 879
S.W.2d 10, 23, 26 (Tex. 1994) (explaining the objective and subjective
components of the test for gross negligence and holding that the evidence did
not support such a finding); see Diamond Shamrock Ref. Co. v. Hall, 168
S.W.3d 164, 171–72 (Tex. 2005) (holding that clear and convincing evidence of
gross negligence did not exist); Coastal Transp. Co. v. Crown Cent.
Petroleum Corp., 136 S.W.3d 227, 231, 234 (Tex. 2004) (holding that evidence did not
support gross negligence). Gross negligence includes both objective and
subjective elements. Moriel, 879 S.W.2d at 23. Objectively, when viewed
from the actor’s perspective, “the act or omission must involve an extreme
degree of risk, considering the probability and magnitude of the potential harm
to others.” Id.
The risk or peril analysis “requires an examination of the events and
circumstances from the viewpoint of the defendant at the time the events
occurred, without viewing the matter in hindsight.” Id. A remote possibility of
serious injury or a high probability of minor injury is not enough. Qwest
Int’l Communs. v. AT&T Corp., 167 S.W.3d 324, 327 (Tex. 2005). Subjectively, the actor must
have had actual “awareness of the risk involved, but nevertheless proceed in
conscious indifference to the rights, safety, or welfare of others.” Id. In this legal
sufficiency review, we must consider whether, viewing the evidence in the light
most favorable to the verdict, there was clear and convincing evidence that
could have led a reasonable juror to form a firm belief or conviction that
Columbia Medical was grossly negligent. See Diamond Shamrock Ref. Co.,
168 S.W.3d at 170. 

            With regard to the objective prong
of the gross negligence analysis, the record fails to show by clear and
convincing evidence that Columbia Medical’s failure to contract for “stat”
echocardiogram services, or its failure to advise the treating physicians of
this limitation, posed an extreme risk of harm to its patients.[1] There is no evidence that, at the time
when Columbia Medical was evaluating its need for medical diagnostic services,
the hospital recognized that the lack of stat echo services would pose an
extreme risk of harm to its patients. See Moriel, 879 S.W.2d at 23 (“If
somebody has suffered grave injury, it may nevertheless be the case that the
behavior which caused it, viewed prospectively and without the benefit of
hindsight, created no great danger.”). To the contrary, as noted in more detail
below, the record shows that although Columbia Medical believed echo services
to be important to its mission, it saw the need for echo services as being rare
enough so as to make in-house services unnecessary. Instead, the hospital chose
to contract for echo services on an as-needed basis. The Hogues do not complain
about the hospital’s decision to outsource echo services; they asserts only
that the hospital’s failure to contract for immediate response times for echo
services was gross negligence. But, in fact, the echo response time provided by
the contractor satisfied the physicians who were responsible for ordering it.

            Dr. Schroeder, who was the director
of Columbia Medical’s intensive care unit (ICU) as well as Hogue’s treating ICU
pulmonologist, ordered the echo after consulting with Dr. Lawson, a
cardiologist. Dr. Schroeder testified that he ordered an echo “now” so that Dr.
Lawson could review the results when he arrived at the hospital. Dr. Lawson,
who believed “stat” meant “within an hour or two,” suggested they “obtain an
echo today, this evening, you know, so that we could assess his cardiac
status,” and that he and Dr. Schroeder “knew it would probably take several
hours to get the echo completed.” Despite the echo technician having told
Hogue’s nurse that it would probably take up to two hours for him to get to the
hospital, Dr. Schroeder’s echo order remained in place, and Hogue’s treating
physicians chose to wait rather than immediately transfer Hogue to another
hospital, which could have been done under the hospital’s policies. The echo
technician arrived at the hospital about two hours after being paged and
completed the study within about twenty minutes. None of Hogue’s doctors
complained about the delay in obtaining the echo. In fact, Dr. Schroeder
testified that Columbia Medical provided the assistance and support he needed
to care for Hogue.

            Not only were Hogue’s doctors
satisfied with the availability of the echo services, but nothing in the record
indicates that the results would have been available sooner had Columbia
Medical pre-arranged for a guaranteed stat echo response time. The record shows
that Hogue’s echo was performed within the maximum response time available from
Cardiovascular On-Call Specialists, Inc., the contractor that provided
technicians to Columbia Medical for echo services. Morton Graham, the president
of Cardiovascular On-Call Specialists, testified that they did not offer
on-call services, to guarantee a fast response, during the hours in which
Hogue’s echo was ordered. Although the Court implies that Columbia Medical
could have guaranteed stat echo response time during business hours by paying
the on-call fee, ___ S.W.3d at ___, the record states otherwise. Graham
testified that Cardiovascular On-Call Specialists “did not offer on-call
services at that time between the hours of 8:00 in the morning and 5:00 in the
afternoon,” Monday through Friday. Graham explained that he could not guarantee
staffing availability during that time because he could not afford the overhead
required to employ someone who was “sitting around waiting in the hope of being
called.” Because he received the call for Hogue’s echo during regular business
hours, the on-call fee would not have been applicable. And even if the company
had offered on-call services at that time and Columbia Medical had contracted
for that guaranteed response time, it is undisputed that the response time for
Hogue’s study would not have been different because Graham responded within the
company’s two-hour guarantee window.[2]
When asked if, under the terms of the contract with Columbia Medical, he could
have done any better than a two-hour guaranteed response time, Graham
responded, “No.” Graham testified that, from time to time prior to the day of
Hogue’s echo, he had received requests to perform stat echos, and, as with
Hogue’s study, he was able to accomplish his goal of responding within two
hours. The record contains no evidence of what response times might have been
available from other companies offering echo services—except that
Cardiovascular On-Call Specialists’ two-hour response time was comparable to
that of its competitors—and no evidence that Columbia Medical could have
contracted for a faster or guaranteed response time.[3] Neither Hogue’s doctors nor the hospital
staff acted, at the time the events occurred, in any way suggesting that the
echo response time created an extreme risk of harm to Hogue.[4] We cannot now, with the benefit of
hindsight, draw that conclusion. Because there is no evidence that the response
time would have been different had Columbia Medical paid for on-call services
or arranged for a guaranteed response time, Columbia Medical’s failure to
ensure faster stat echo response time does not support a finding of gross
negligence.

            Even if Columbia Medical’s failure
to ensure a guaranteed stat echo response time created an extreme risk to
Hogue, the record lacks clear and convincing evidence of the subjective prong
of the gross negligence analysis: that Columbia Medical was actually aware of
the extreme risk and consciously disregarded it. “What separates ordinary
negligence from gross negligence is the defendant’s state of mind; in other
words, the plaintiff must show that the defendant knew about the peril, but his
acts or omissions demonstrate he did not care.” Diamond Shamrock Ref. Co.,
168 S.W.3d at 173 (quoting Louisiana-Pacific Corp. v. Andrade, 19 S.W.3d
245, 246–47 (Tex.
1999)). When the hospital was being established, the administration considered
whether echo services should be available, and it was agreed that they should.
But a market analysis projecting very low need for echocardiograms in the relatively
young community the hospital would serve, and the availability of experienced,
competent technicians, led Columbia Medical, with the advice of Dr. Overbeck,
Chief of Medicine and a representative of the hospital’s main cardiology group,
to decide to outsource the service. The plaintiffs do not claim that
outsourcing the echo procedure was in any way improper.[5] The sole complaint is that the hospital
should have assured a stat response time when it was needed. The evidence is
inconclusive about what a stat response time is—somewhere between thirty
minutes and two hours—and whether Cardiovascular On-Call Specialists or any
other echocardiogram contractor could have provided a guaranteed shorter
response time if requested. The evidence shows that, until March 9, 1998,
Columbia Medical believed its echo contractor, who responded to stat echo
orders within two hours, was doing a “great job” and “providing a level of
service that was consistent with the needs and expectations of the medical
staff,” and the physicians were very happy with the service provided. Even
assuming that stat echo results should have been available in a much shorter
time, the evidence does not establish that Columbia Medical was actually, subjectively
aware that its failure to provide such a response time created a likelihood of
serious injury to patients but then acted with conscious indifference toward
that risk. At most, the evidence shows that Columbia Medical was negligent in
not considering the risk or appreciating the danger of failing to arrange for
immediate echo services, but the evidence does not establish gross negligence.
Scott Montgomery, Columbia Medical’s Director of Clinical Outpatient Services
who negotiated the contract with Cardiovascular On-Call Specialists, testified
that he was concerned about the timeliness with which echocardiograms were
going to be done and was focused on making sure the contracted services would
meet the needs and expectations of the hospital’s physicians. That is a far cry
from showing that the hospital knew, but did not care, that by not having
immediate echo services, some patients would die.

            Because no clear standard exists for
a stat echo response time, the next point of contention is that the hospital
administrators failed to make it clear to treating physicians that stat echo
might not be available at the hospital, and that a patient needing it might
have to be transferred to another facility. The Court focuses on expert
testimony that hospitals should have guidelines for provision of contracted
services, and that hospitals should communicate the limitations on services to
its staff. ___ S.W.3d at ___. Although Columbia Medical’s hospital
administrators admitted they made no effort to inform the medical staff of the
echo capabilities and potential response times, the ICU nurse manager at the
time Hogue was treated at Columbia Medical testified that she was aware the
hospital outsourced its echo services, that she passed that information on to
all of the nurses she hired, and that the previously hired nurses “already
knew.” With no evidence that anything more was done to inform physicians and
the medical staff about the hospital’s echo capabilities, a reasonable juror
could have concluded that Columbia Medical was negligent. But the evidence
falls far short of showing the “black heart” required of the actor to qualify
for a gross negligence finding. The hospital administrators responsible for
echo services knew the medical staff had been satisfied with the existing
arrangement for echo services, and Hogue’s treating physicians testified that
the hospital provided the services necessary to care for Hogue. As noted,
before Hogue’s echo was performed, Dr. Schroeder knew that a technician would
have to be brought in from off-site and assumed it would take several hours for
the echo to be completed. Moreover, the nursing staff knew that a technician
likely would not arrive to begin the echo for at least an hour and a half.
Under these circumstances, it is not reasonable to conclude that Columbia
Medical’s failure to communicate to its staff that echo services were
outsourced, or that stat echos were not available, exhibited conscious
indifference to an extreme risk. 

            The Court focuses on evidence
regarding appropriate stat echo response time, concluding that Columbia Medical
breached the standard of care by not ensuring a shorter response time. ___
S.W.3d at ___. But the evidence is uncontroverted that no federal or state law
or rule governs stat echo response times; that no published medical guidelines
apply to stat echo response times; that Cardiovascular On-Call Specialists did
not offer a guaranteed response time when Hogue’s study was ordered; that even
if Cardiovascular On-Call Specialists had offered a guaranteed response time
and Columbia Medical had paid for that service, the response time for Hogue’s
study would not have been different; and that the medical staff at Columbia
Medical had been satisfied with the echo services provided under the contract
with Cardiovascular On-Call Specialists. In addition, there is no evidence that
Columbia Medical could have obtained a contract from another company that would
ensure a faster response time; in fact, the evidence shows that Cardiovascular
On-Call Specialists’ two-hour stat echo response time was consistent with what
competitors provided. On appellate review, we do not disregard undisputed
evidence that does not support the jury’s finding because doing so could skew
the analysis of whether there is clear and convincing evidence. Diamond
Shamrock Ref. Co., 168 S.W.3d at 170 (quoting In re J.F.C., 96
S.W.3d 256, 266 (Tex. 2002)). In this case, the record fails to show the
required clear and convincing evidence of a state of mind so indifferent to
peril as to elevate the hospital’s conduct from negligence to gross negligence.

            Viewing the record in the light most
favorable to the Hogues, reasonable jurors could have concluded that Columbia
Medical acted with negligence, but not gross negligence. Without clear and
convincing evidence to support the necessary gross negligence elements, the
jury’s finding must be set aside. See Universal Servs. Co. v. Ung, 904
S.W.2d 638, 641–42 (Tex. 1995). Because the Court fails to do so, I dissent.

 

            ____________________________

            PAUL W. GREEN

            JUSTICE

 

OPINION DELIVERED: August 29,
2008














[1]
I also believe the record fails to show by clear and convincing evidence that
Columbia Medical was grossly negligent for the other grounds claimed by the
Hogues, but not addressed by the Court.





[2]
The record indicates that Cardiovascular On-Call Specialists, Inc. did charge
Columbia Medical an $85 stat fee for Hogue’s echo, however.





[3]
The Court states that Morton Graham would have been willing to negotiate
appropriate terms if Columbia had wanted to guarantee stat echo capabilities,
but that Columbia Medical was not interested in doing so. ___ S.W.3d at ___.
The record, however, does not reflect this. Graham testified that he would have
been interested in talking with the hospital about possibilities to get stat
echos in 30 to 45 minutes, and he testified that he would have done everything
he could to negotiate “something that made . . . business sense,” or he claimed
he would have told the hospital if he couldn’t accommodate it. But the trial
court sustained an objection to a question asking whether it would have been
feasible for Cardiovascular On-Call Specialists to provide a quicker guaranteed
response time, if there had been discussions with the hospital about doing so.
In fact, the trial court refused to allow “a hypothetical about could they have
negotiated a different contract with a reduced response time . . . opening up
all terms, including, I mean, if you pay somebody a million dollars a year can
you get them to do this . . . .”





[4]
In fact, Dr. Schroeder testified that, despite Columbia Medical having to call
in an outside technician, the risk of transferring Hogue outweighed the
potential of getting faster echo results from another hospital. Dr. Schroeder
believed that Hogue was not stable to transfer at that point and testified that
it was more likely than not that, whether the echo was conducted then or soon
after, Hogue would have died anyway. The majority cites Dr. Levitsky’s
testimony of a ninety percent survival chance if Hogue had been diagnosed and
transferred earlier, ___ S.W.3d at ___, but Dr. Levitsky also testified that,
even considering the response time, Hogue would likely have survived if he had
been transferred within an hour after completion of the echo. It can hardly be
said that the response time created an extreme risk of serious injury or death
when even the Hogues’ expert believed that, immediately following the echo,
Hogue’s survival chances were quite good.





[5]
Likewise, the Court says that its holding does not require all hospitals to
provide all services. ___ S.W.3d at ___. But if it takes fifteen to twenty
minutes to conduct an echo, as the record in this case indicates, and if, as
the Court suggests, stat echo results should be available within thirty minutes
or so, it is hard to imagine how it can be reasonable any longer for a hospital
to outsource its echo services.