Affirmed and Opinion filed August 28, 2008








Affirmed and Opinion filed August 28, 2008.

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-07-00210-CV

_______________

 

DONNA ARDOIN, INDIVIDUALLY AND AS LEGAL REPRESENTATIVE
OF THE ESTATE OF FLOYD ARDOIN, DECEASED, Appellant

 

V.

 

ANHEUSER-BUSCH, INCORPORATED, Appellee

                                                                                                     
                                          

On Appeal from the 157th District Court

Harris County, Texas

Trial Court Cause No. 2005-06494

                                                                                                              
                                 

 

O P I N I O N








In this
appeal from the trial court=s grant of the defendant employer=s motion for no-evidence summary
judgment in a gross-negligence lawsuit, the deceased worker=s spouse and estate contend there is
more than a scintilla of evidence that the employer was consciously indifferent
to a known extreme risk.  Because we conclude the summary-judgment evidence
does not raise a question of material fact regarding the employer=s awareness or indifference to a risk
that would expose its employees to the danger at issue, we will affirm the trial
court=s judgment. 

I.  Factual and Procedural Background[1]

Floyd
Ardoin (AFloyd@) worked as a Apalletizer tender@ for Anheuser-Busch, Inc. (AAnheuser-Busch@ or Athe company@) at its Houston brewery.  A Apalletizer@ is a piece of industrial equipment
used in packaging cans onto pallets and encasing the packages in shrink-wrap. 
At the time of these events, there were approximately fifteen palletizers at
the Anheuser-Busch Houston facility.  One was manufactured by Wyard and had
been placed in service in 1994; the remainder were manufactured by Alvay. 
Because an understanding of the relevant facts requires some knowledge of the
Wyard palletizer=s operation, we summarize the pertinent testimony of
Anheuser-Busch mechanics Ed Fischer, Ed May, and Glenn Miller below.

A.        Wyard Palletizer Operation

The back
of the palletizer is on a higher level than the front.  A catwalk runs along
the bank of palletizers at the upper level, and a control panel for the Wyard
palletizer is located there.  The control panel contains a switch for
restarting the palletizer and colored lights to indicate problems or jams.  








Pallets
enter the palletizer on the upper level and are dispensed from the lower level
at the front of the machine.  First, empty pallets are placed on a chain that
conveys them to the accumulation area at the back of the palletizer on the
upper level.  Rollers then move the pallets into a stack in the magazine.  On
the lower, front side of the palletizer, a carriage pushes retractable forks
toward the magazine.  Hydraulic power moves the forks vertically, but their
forward motion is powered by a pneumatic ram.  The area of the palletizer
occupied by the moving forks is identified in the record as the Adispensing@ or Amagazine area@ of the palletizer.  The forks lift
the stack of pallets, leaving the bottom pallet on a conveyor chain.  The chain
then carries the bottom pallet Adownstream@ to a Ahoist@ area to receive cases of beer. 

The
Wyard palletizer can be operated automatically or manually.  When it is
operating automatically, an electric photo eye in or near the machine projects
a beam of light.  When the beam of light is broken, the photo eye sends an
output signal to the palletizer solenoids, which then allow pressurized air to
drive the fork carriage forward.  Electric power to the palletizer and the photo
eyes can be turned off by pushing one of the Ae-stop@ buttons at the lower level.  If an
e-stop button is pressed before the photo eye has been activated, the photo eye
is turned off and does not send a signal to the solenoids to move the forks
forward.  If the forks have already moved forward, however, pressing an e-stop
button will not release the pneumatic pressure that drives the forks.  The air
pressure can be released by turning a valve and disconnecting a hose, or by
pressing a recessed part of a solenoid using a pencil point or a Apunch.@  The forks also can be retracted
when the palletizer is switched to manual operation.

Workers
called Apalletizer tenders@ are employed to clear pallet jams. 
To clear a jam, the tender could switch the palletizer to manual operation and
retract the forks.  Alternatively, the tender could push an e-stop button and
remove the jammed pallet while standing on the lower level or the catwalk and
using one of the hooks provided by the company.  The tender also could call a
mechanic to release the air pressure holding a jammed pallet against the
magazine or between the forks. 

B.        The Accident








On
October 24, 2004, Floyd attempted to clear a pallet jam from the Wyard palletizer. 
He did not switch the machine to manual operation and retract the forks, access
the jam from the back of the machine, or push an e-stop button to turn off
electricity to the palletizer.  Instead, he left the machine operating in its
automatic mode, crawled through a small space under the side of the palletizer,
and stood up inside the magazine area.

Joe
Rodriguez was also working as a palletizer tender that day.  From the control
panel on the upper level, he saw that the Wyard palletizer displayed an amber
light, which indicated that it was Acalling for a pallet.@  Rodriguez descended halfway down
the catwalk stairs and saw Floyd near the palletizer.  Rodriguez believed that
Floyd was clearing the jam, so he attended to problems at two other palletizers
before he returned to the upper level.  When he saw that the Wyard palletizer
still displayed an amber light, Rodriguez went downstairs to investigate.

On the
lower level, Rodriguez initially could not see Floyd, but twice heard him call,
AJoe.@  When Rodriguez found him, Floyd was
unconscious and trapped inside the Wyard palletizer.  Floyd was holding a pallet
against his chest, and the carriage that drives the forks held him pinned
against the frame of the magazine.   

Rodriguez
immediately hit the e-stop button.  This button turned off the electricity to
the machine but did not release the carriage, which was held in place by air
pressure.  Rodriguez went to the upper level and told Deborah Hunt, a member of
Anheuser-Busch=s emergency response team, that Floyd was badly hurt.  He also told
mechanic Glenn Miller to release the air pressure from the Wyard palletizer. 
After Miller released the air pressure from the pneumatic ram by turning a
valve and disconnecting a hose, employees were able to move the carriage away
from Floyd.  By that time, however, Floyd  had suffocated.  








Ardoin=s widow, Donna Ardoin, and his estate
(collectively, AArdoin@) sued Anheuser-Busch for gross negligence and sought
exemplary damages.  The company moved for summary judgment on the grounds that
there is no evidence it was subjectively aware of an extreme risk to Floyd or
was consciously indifferent to his safety.  The trial court granted the motion,
and Ardoin brought this appeal.  

II.  Issue Presented

In a
single issue, Ardoin contends the trial court erred in granting Anheuser-Busch=s  motion for no-evidence summary
judgment on the gross-negligence claim.  

III.  Standard of Review

In
reviewing the trial court=s grant of a motion for no-evidence summary judgment, we
examine the record in the light most favorable to the nonmovant; if the
nonmovant presents more than a scintilla of evidence supporting the disputed
issue, summary judgment is improper.  Tex.
R. Civ. P. 166a(i); Forbes Inc. v. Granada Biosciences, Inc., 124
S.W.3d 167, 172 (Tex. 2003); King Ranch, Inc. v. Chapman, 118 S.W.3d
742, 751 (Tex. 2003).  The evidence is sufficient if it would allow reasonable
and fair-minded people to differ in their conclusions.  King Ranch, 118
S.W.3d at 751 (citing Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d
706, 711 (Tex. 1997)).  On the other hand, evidence is insufficient to defeat a
motion for no-evidence summary judgment if it does no more than create a mere
surmise or suspicion that a challenged material fact exists.  Id. at 751
(quoting Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983)). 
Evidence that is so slight as to make any inference a guess is the legal
equivalent of no evidence.  Ford Motor Co. v. Ridgway, 135 S.W.3d 598,
601 (Tex. 2004).  We consider the movant=s evidence only if it creates a
question of material fact.  See Binur v. Jacobo, 135 S.W.3d 646, 651
(Tex. 2004).  See also City of Keller v. Wilson, 168 S.W.3d 802, 825
(Tex. 2005) (noting that, when reviewing a motion for no-evidence summary
judgment, the appellate court=s review of the evidence Awill effectively be restricted to the
evidence contrary to the motion@).  








IV.  Analysis

A.          Statutory Gross Negligence

Although
workers= compensation benefits are ordinarily
the exclusive remedy against an employer for an employee=s work-related death, the deceased
worker=s legal beneficiaries may recover
exemplary damages if the employer=s gross negligence caused the worker=s death.  Tex. Lab. Code Ann. ' 408.001 (Vernon 2006); Tex. Civ. Prac. & Rem. Code Ann. ' 41.003(a) (Vernon 2008)
(permitting recovery of exemplary damages if the claimant proves that fraud,
malice, or gross negligence caused the harm at issue).  Gross negligence is
statutorily defined as an act or omission:

(A)      which when viewed objectively from the standpoint of the actor
at the time of its occurrence involves an extreme degree of risk, considering
the probability and magnitude of the potential harm to others; and

(B)      of which the actor has
actual, subjective awareness of the risk involved, but nevertheless proceeds
with conscious indifference to the rights, safety, or welfare of others.

Tex.
Civ. Prac. & Rem. Code Ann. ' 41.001(11).  To constitute gross
negligence, the employer=s act or omission must satisfy both the objective and
subjective elements.  Id.; Transp. Ins. Co. v. Moriel, 879 S.W.2d
10, 21B22 (Tex. 1994).  Objectively, the
employer=s conduct must involve Aan extreme degree of risk.@  Tex.
Civ. Prac. & Rem. Code Ann. ' 41.001(11) (emphasis added). 
This element is satisfied only if the employer=s act or omission is likely to cause
serious injury.  See Moriel, 879 S.W.2d at 22.  To fulfill the subjective
element, a claimant must show that the employer demonstrated conscious
indifference despite its Aactual awareness of the extreme risk created by [its]
conduct.@  Id. (citing Wal-Mart
Stores, Inc. v. Alexander, 868 S.W.2d 322, 326 (Tex. 1993)).  








Although
these requirements may be met through direct or circumstantial evidence, see
id., they are not satisfied through proof of ordinary negligence or even
bad faith.  Tex. Civ. Prac. & Rem.
Code Ann. ' 41.003(b); Lee Lewis Constr., Inc. v. Harrison,
70 S.W.3d 778, 785 (Tex. 2001).  As the Texas Supreme Court repeatedly has
emphasized, Awhat separates ordinary negligence from gross negligence is the defendant=s state of mind;  in other words, the
plaintiff must show that the defendant knew about the peril, but his acts or
omissions demonstrate that he did not care.@  Diamond Shamrock Ref. Co. v.
Hall, 168 S.W.3d 164, 173 (Tex. 2005) (quoting La.-Pac. Corp. v. Andrade,
19 S.W.3d 245, 246B47 (Tex. 1999)).  Thus, conduct that is Amerely thoughtless, careless, or not
inordinately risky@ is not grossly negligent.  Moriel, 879 S.W.2d at 22. 


In
Ardoin=s live pleading at the time of
summary judgment, Ardoin alleged that Anheuser-Busch was grossly negligent
because it failed to equip the Wyard palletizer with Aguards such as interlock gates or
electric eyes around it to prevent employees from coming in contact with moving
equipment while the equipment was energized.@  On appeal, Ardoin does not dispute
that Anheuser-Busch provided training and had safety policies and measures in
place that would have prevented the accident if Floyd had followed them.  See
Andrade, 19 S.W.3d at 247 (ACorporate safety policies, or the lack of them, can serve as
the basis for a gross negligence finding.@); see also Diamond
Shamrock, 168 S.W.3d at 171B72 (failure to implement redundant safety systems held to be
no evidence of conscious indifference); Agrium U.S., Inc. v. Clark, 179
S.W.3d 765, 767 (Tex. App.CAmarillo 2005, pet. denied) (AAn actor=s failure to pursue the safest course
available or provide the best warnings imaginable does not necessarily equate
to a want of caring.@ (citing Gen. Motors Corp. v. Sanchez, 997 S.W.2d 584,
597B98 (Tex. 1999))).  Instead, Ardoin
argues that Anheuser-Busch was consciously indifferent to the risk that workers
would take actions contrary to their training, whether intentionally or
inadvertently.  








Through
its motion for summary judgment, Anheuser-Busch challenged only the subjective
components of gross negligence, and asserted there was no evidence it knew of
the risk at issue or was consciously indifferent to the risk posed to its
employees.  Thus, we review the summary-judgment record for evidence that
Anheuser-Busch was subjectively aware that, in the absence of guards, employees
might enter the dispensing area of the palletizer while it was activated, such
that the company=s failure to provide guards to prevent entry Ademonstrate[s] that it did not care
about the consequences to [Floyd] of a known extreme risk of danger.@  See Tex. Dep=t of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 232 (Tex. 2004).  

B.        Imputing Gross Negligence
to a Corporation

Because
a corporation can act only through individuals, we distinguish between acts
that are directly attributable to the corporation and acts that are solely
attributable to its agents or employees.  See Mobil Oil Corp. v. Ellender,
968 S.W.2d 917, 921 (Tex. 1998).  A corporation is grossly negligent if it
authorizes or ratifies an agent=s gross negligence, or if it is directly negligent in hiring
an unfit agent.  Id.  A corporation also may be grossly negligent through
the acts or omissions of a vice-principal.  Id. at 922.  Such
vice-principals include corporate officers; those who have authority to employ,
direct, and discharge other employees; those engaged in performing the
corporation=s nondelegable or absolute duties; and those responsible for the
management of the whole or a department or a division of the business.  Id. 
In determining whether acts are directly attributable to the corporate
employer, we do not restrict our review to individual elements or facts but
instead consider all the surrounding facts and circumstances to determine
whether the corporation itself is grossly negligent.  Id.  These facts
and circumstances include reasonable inferences that can be drawn from the
corporation=s acts or omissions.  Id. 

C.        Knowledge that Workers
Forget or ACut Corners@








On
appeal, Ardoin contends she produced sufficient evidence that Anheuser-Busch
knew its employees Awould, on occasion, either forget or choose not to press the
E-stop prior to entering a palletizer to clear a jam.@  In support of this argument, Ardoin
cites summary-judgment evidence that demonstrates the company=s awareness that employees sometimes
disregarded or failed to follow correct procedures.  For example, Dale Pendleton,
Senior Director of Environmental Health, Safety, and Security (AEHS&S@) for the company, testified, AIt=s possible as human beings that we
forget procedures.  And we forget - - human beings forget to take - - forget
all kinds of things and forget to take proper precautions that they=ve been trained to take.@ Philip Jost, Resident EHS&S
Manager for the company=s Houston facility, testified that palletizer tenders are
trained in clearing pallets because it Acould be a hazard to the employee
should they do it incorrectly . . . .@  Supervisor Bernard Montgomery
acknowledged that Asometimes employees will take short cuts,@ and employee Jimmy Osborn agreed
that workers sometimes Acut corners.@  This generalized testimony, however, is not evidence that
Anheuser-Busch was subjectively aware that employees would not only fail to use
e-stops, but were likely to enter the dispensing area of the palletizer while
it remained in automatic operation.  

Ardoin
also points to summary-judgment evidence that employees actually entered the
palletizer to clear jams.  Employee Harrol Williams testified that workers of
smaller stature, including Floyd Ardoin, had to enter the machine to reach a
jam; however, Williams did not specify whether these workers used the e-stops,
manually retracted the forks, asked mechanics to release the air pressure
before entering, or entered the back of the palletizer, away from moving
parts.  This is significant because there is evidence that some tenders entered
the magazine from the higher level at the back of the palletizer (as
distinguished from the dispensing area in front of the magazine), but there is
no evidence that this procedure exposed workers to extreme risk.  Thus,
evidence of such entry, such as the following testimony of Bernard Montgomery,
the company=s Group Manager Supervisor, does not support Ardoin=s position as alleged:

Q:        Were you always able to get the pallets out using a hook, or
did you sometimes have to actually get into the machinery and pull a pallet
out?

A:        Actually had to get into the machine.








Q:        All right.  And on those occasions when you actually had to
get in the machinery, I take it you hit the E-stop button?

A:        Correct.

Q:        And once you hit the E-stop button, according to the training
you received, it was your understanding that those forks were not going to move
any more, correct?

A:        That=s not correct.  That=s not what I said.

Q:        All right.

A:        Based on my training,
hit the E-stop, clear the jams from the back side of the palletizer, where you=re not exposed to any moving - - any
moving forks or anything in front. 

(Emphasis added).[2] 
Unlike Floyd, Montgomery used the e-stop button and cleared jams without
exposing himself to the moving forks.  Moreover, Montgomery subsequently
testified that he had never seen anyone access the palletizer from the side as
Floyd did.  

Ardoin
produced similar testimony from production operator Courtney Armstead. 
Armstead agreed that to clear a jam on the Wyard palletizer, Ayou would put the machine in manual,
lower the pallet forks, back them out of position, reverse the operation of the
chain so that it pulls the stack out of position, and then you get into the
back side of the machine and pull the pallet
out . . . .@ (emphasis added).  Armstead further testified that he has never
had to clear a jam from the magazine area of the Wyard palletizer.     








Although
such testimony demonstrates that workers sometimes entered the magazine itself
through the back of the palletizer, it is not evidence that Anheuser-Busch was
aware that guards were necessary to prevent employees from entering the
dispensing area in front of the magazine while the machine was operating.[3] 
Regarding entry into the dispensing area, Ardoin=s strongest evidence concerns the
practices and experience of Floyd=s supervisor Ruben Gonzalez and
mechanics Ed Fischer and Ed May.  For the reasons discussed below, however,
their testimony presents less than a scintilla of evidence that Anheuser-Bush
was subjectively aware that the absence of guards on the sides of the Wyard
palletizer presented an extreme risk.

D.        Testimony Concerning
Supervisor Ruben Gonzalez

According
to Debra Hunt, supervisor Ruben Gonzalez told her after Floyd=s death that employees could hear a
sound that warned them the forks of the Wyard palletizer were preparing to move
forward.  Hunt testified, AI was told that it was common knowledge there [were] lots of
jams in that area, and they had three seconds - - and I=m thinking I remember three seconds
from the time you heard the >sssshhhh,= release of the forks, to get out.@  She further stated, AI don=t know if it was the forks
activat[ing].  But that=s what I understood, that it was multiple jams [sic] and they
had three seconds from the time of the shush they heard, to get out of harm=s - - I guess, I=m assuming, I guess I=m saying get out of harm=s way.@  

Gonzalez
testified that he had seen mechanics in the area between the forks and the
magazine on more than one occasion, but the mechanics used the e-stop and were Abelow the chains and everything else.@  Gonzalez further testified that
several times he had crawled into the area where he had seen the mechanics
working, and he did not always use the e-stop on these occasions.  According to
Gonzalez, he remained on his hands and knees because A[o]therwise I would be inside the
machine, if I stood up.  As long as I=m underneath the machine, I know the
machine can=t crush me or do anything to me.@  








Ardoin
argues that Gonzalez had knowledge of the extreme risk to anyone  who stood
inside the machine while it was activated, and contends that Gonzalez was
consciously indifferent to Floyd=s safety because he breached his duty
as a warehouse supervisor to warn Floyd of this risk.[4] 
Acccording to Ardoin, Gonzalez=s indifference to Floyd=s safety is attributable to
Anheuser-Busch.

This
argument is unpersuasive for several reasons.  First, Gonzalez described his
duties as a warehouse supervisor as Atruck dock manager or palletizer
foreman,@ but Ardoin offered no evidence that
his actions were authorized or ratified by Anheuser-Busch or that the company
was otherwise aware of his actions.  In the absence of such evidence, the acts
of a lower-level employee such as a foreman are not attributable to the
corporation.  See Qwest Int=l Commc=ns, Inc. v. AT&T Corp., 167 S.W.3d 324, 326 (Tex. 2005)
(per curiam).  In addition, Gonzalez testified that he was identifying his own
practices.  He stated, AAnheuser-Busch=s rule may be different.  But I was
always told that if you enter the machine, you hit the e-stop.  I do not consider
entering the machine being underneath it.@ Despite his narrow interpretation of
what it means to Aenter the machine,@ Gonzalez testified that
Anheuser-Busch trains its employees to use the e-stops, to remove the pallets
from the magazine at the back of the machine, and to use a hook to clear the
jam while standing inside the magazine itself rather than standing in the
dispensing area between the magazine and the forks.  Finally, Gonzalez
testified that no one saw him crawl below the chains in the dispensing area of
the palletizer, and he told no one of this practice; thus, there is no evidence
that the corporation was aware that employees might interpret the rules in a
manner that permitted entry into the dispensing area while the machine was
operating.[5]   








E.        Mechanics Ed Fischer and Ed
May

Mechanic
Ed Fischer testified that, like Floyd Ardoin, he actually stood inside the
Wyard palletizer on one occasion in 1996 without first pushing an e-stop:  

[T]he
machine had stopped because there was no pallet on the hoist.  And it=s signalling [sic],  AI don=t have a pallet on the hoist.@  So I went down and I saw that the pallet was
dislodged on the chains.  But I also knew when I went under there, I was taking
a very severe risk.  

I had an exit plan.  If I broke the
eyes and those forks started to come forward, then I would duck down out of the
way.

Fischer agreed that the
palletizer produces a Ashoosh@ noise three to five seconds before the forks move forward. 
In this instance, Fischer moved out of the way in time to avoid injury, and he
never performed the maneuver again.  He did not report the incident to any
supervisors, managers, or even palletizer tenders.  

In 2000,
the forks of the Wyard palletizer had Ajumped the track,@ and Fischer and fellow mechanic Ed
May arrived to repair it.  May pressed the e-stop button on his side of the
palletizer, then began to climb over a hydraulic tank next to the palletizer to
access the area between the forks and the magazine.  When Fischer saw May
climbing over the tank, Fischer stopped May and told him of his Anear-miss@ four years earlier.  May reassured
Fischer that he had used the e-stop; nevertheless, he did not enter the
palletizer.[6]  May had not
seen or heard of anyone else entering the machine as Fischer did.  








Although
Fischer was aware of the risk of standing in the dispensing area without
pushing an e-stop and shared his knowledge with May, there is no evidence that
either mechanic alerted an Anheuser-Busch manager or supervisor that an
employee might engage in such conduct.  Thus, their testimony is not evidence
that Anheuser-Busch was subjectively aware that employees might do so.  See
id.

F.        Insufficiency of Remaining
Evidence

The
remaining evidence presents less than a scintilla of evidence that
Anheuser-Busch had Asubjective awareness of the risk involved@ in its failure to install additional
guards.  Palletizer tender Norma Perez testified that she was injured near the Ahoist@ area of the palletizer when she
failed to use an e-stop, but her injury was caused by falling pallets, not by
the machinery=s moving parts.  She did not enter the palletizer, and there is no
evidence that the company=s failure to install guards played any role in that
accident.    

Ardoin
also cites evidence that Anheuser-Busch had knowledge of the availability of
barriers, fences, electric eyes, gates, and other such safety devices, and that
it was technologically and economically feasible to install such devices on the
Wyard palletizer before Floyd=s death.  The relevant inquiry, however, is not whether there
is evidence that the company knew of additional available means to prevent
death or serious injury.  See Agrium, 179 S.W.3d at 769 (reversing
finding of gross negligence although it was Abeyond doubt that other measures
could have been taken by all involved to prevent the incident or reduce the
risk involved@).  Instead, we ask whether there is more than a scintilla of evidence
that the company was subjectively aware of the risk involved with its act or
omission.  See Tex. Civ. Prac.
& Rem. Code Ann. ' 41.001(11)(B).  








The
summary-judgment evidence does not raise a question of material fact regarding
Anheuser-Busch=s awareness or indifference to a risk that palletizer tenders would
expose themselves to the danger of being pressed between the magazine and the
forks or carriage of the palletizer.  The Wyard palletizer had been in use for
ten years, and Ardoin produced no evidence that the company=s existing safety measures had previously
failed to protect employees against this particular risk.  See Diamond
Shamrock, 168 S.W.3d at 172 (holding that failure to implement redundant
safety systems is no evidence of conscious indifference to the risk of
explosion where a check valve appeared to have protected against that risk for
fifteen years).  And despite Ardoin=s suggestions to the contrary, Floyd
did not simply fail to use the e-stop; he also avoided the company=s multiple safety precautions.  He
did not use a hook to clear the jam from the outside or access the palletizer
from the back, away from moving parts.  He did not switch the palletizer into
manual operation and retract the forks, and he did not call a mechanic to
release the air pressure from the palletizer.  Instead, he left the machine
running in its Aautomatic@ mode, crawled under its side, and stood up in the area of
the machine where the forks are driven into the stacked pallets by a pneumatic
ram.  Ardoin produced no more than a scintilla of direct or circumstantial
evidence that Anheuser-Busch had actual, subjective knowledge that a palletizer
tender would engage in such conduct.  We therefore overrule the sole issue
presented on appeal.

V.  Conclusion

Construing
the summary-judgment evidence in Ardoin=s favor, we conclude that it
constitutes less than a scintilla of evidence that Anheuser-Busch had actual,
subjective knowledge of the risk at issue or acted with conscious indifference
to that risk.  We therefore overrule Ardoin=s sole issue on appeal and affirm the
judgment of the trial court.       

 

/s/        Eva M. Guzman

Justice

 

 

Judgment rendered and Opinion filed
August 28, 2008.

Panel consists of Justices Frost,
Seymore, and Guzman. 









[1]  The facts summarized below are drawn from the
evidence produced by Ardoin in response to Anheuser-Busch=s motion for no-evidence summary judgment.





[2]  Montgomery further testified that he was trained A[t]o kill all the power source to the machine before
entering it.@ 





[3]  We disregard evidence unfavorable to Ardoin,
including testimony from other employees denying knowledge that the dispensing
area was accessible, or denying that they would enter that area of the palletizer.






[4]  There is no evidence that Gonzalez was responsible
for training palletizer tenders, and co-worker Norma Perez testified that Floyd
was trained by Dan LaBeaux or Mike Smith. 





[5]  At best, Gonzalez=s
testimony illustrates his own failure to recognize the risk to which he exposed
himself.   Moreover, Ardoin alleged that Anheuser-Busch was grossly negligent
because it failed to install available guards, not because it failed to warn.





[6]  Ardoin also cites conflicting testimony that the
forks of the Wyard palletizer might move forward even if the e-stop had been
pressed.  Such evidence does not support Ardoin=s contention that the company disregarded the risk posed to employees
who entered the palletizer without pressing the e-stop.  Moreover,
Ardoin does not allege that Floyd pressed an e-stop, and offers no evidence
that he did so.