COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-10-149-CV

 

 

IN THE MATTER OF T.J.H.                                                                    

                                                                                                        

 

                                              ------------

 

          FROM
COUNTY COURT AT LAW NO. 1 OF WICHITA COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I. 
Introduction

In one
issue, Appellant T.J.H. challenges the legal and factual sufficiency of the
evidence to support her involuntary commitment for temporary inpatient mental health
services.[2]  We affirm.

 








II. 
Factual and Procedural Background

All of
the following documents referenced below were in the trial court=s file
at the time of the May 3, 2010 hearing. 
The trial court took judicial notice of the file=s
contents before the hearing began.








On April
15, 2010, at around 10:45 a.m., Pecan Valley Mental Health and Mental
Retardation (MHMR) intensive case manager Damon McMilliam met with T.J.H.  He noted his impressions[3]
and then filed a sworn application for T.J.H.=s
emergency apprehension and detention, stating that T.J.H. was delusional,
having hallucinations, yelling, making threats and remarks about killing
people, and cursing at staff and police. 
See Tex. Health & Safety Code Ann. ' 573.011
(Vernon 2010).  A magistrate immediately
issued a mental health warrant for emergency detention, ordering that T.J.H. be
apprehended and transported to the North Texas State Hospital (NTSH) in Wichita
Falls.  See id. ' 573.012
(Vernon 2010).

On April
16, a sworn application for temporary court-ordered mental health services was
filed, alleging that T.J.H. 

is likely to cause serious harm to others; (OR) is suffering severe
and abnormal mental, emotional or physical distress; experiencing substantial
mental or physical deterioration of his/her ability to function independently,
which is exhibited by the proposed patient=s inability, except for reasons of indigence, to
provide for the proposed patient=s needs, including food, clothing, health, or
safety and not able to make rational and informed decisions as to whether to
submit to treatment.[4]

 

See id.
'' 574.001B.002
(Vernon 2010).  As noted on the
application, T.J.H. was not charged with any criminal offense.








The
State filed a motion for an order of protective custody of T.J.H. pending
resolution of the case, and the trial court granted it.  See id. ' 574.021
(Vernon 2010).  The trial court appointed
an attorney to represent T.J.H., set dates for a probable cause hearing and the
application hearing, and issued notice to T.J.H.  See id. '' 574.003,
.005B.006,
.025 (Vernon 2010).  At the probable
cause hearing, the hearing officer determined that there was probable cause to
believe that T.J.H. presented a substantial risk of harm to others such that
she could not be at liberty pending the final hearing and ordered that she
continue to be detained at NTSH.  See
id. ' 574.025.

The
record contains two sworn certificates of medical examination for mental
illness.  See id. ' 574.009
(Vernon 2010).  Dr. Satyam Jain, M.D.
issued the first, averring that he had examined T.J.H. on April 15 at NTSH and
that he had diagnosed her with schizoaffective disorder.  He stated that, as a result of her illness,
T.J.H. was likely to cause serious harm to others or was suffering severe and
abnormal mental, emotional, or physical distress; was experiencing substantial
mental or physical deterioration of her ability to function independently,
exhibited by her inability, except for reasons of indigence, to provide for her
needs, including food, clothing, health, or safety; and was unable to make a
rational and informed decision as to whether to submit to treatment.  See id. ' 574.011(a)(7).  








Dr. Jain
set out the following factual basis for his opinion:  T.J.H. was Apsychotic
and delusional, swearing and cursing on [sic] a guard (imaginary) and wants to
kill him because he killed her.@[5]  He stated that he believed that T.J.H.
presented a substantial risk of serious harm to herself or others if not
immediately restrained, based on her behavior and Aby
evidence of severe emotional distress and deterioration in [her] mental
condition to the extent that [she] cannot remain at liberty.@  He recommended inpatient hospitalization and
noted that T.J.H. had had multiple previous psychiatric hospitalizations.








Dr.
Cecile Soliven, M.D. issued the other certificate of medical examination for
mental illness, stating that she evaluated T.J.H. on April 26 and diagnosed her
with Achronic
schizophrenia, undifferentiated.@  As a result of T.J.H.=s
illness, Dr. Soliven found that T.J.H. was suffering severe and abnormal
mental, emotional, or physical distress; was experiencing substantial mental or
physical deterioration of her ability to function independently as exhibited by
her inability to provide for her basic needs; and was unable to make a rational
and informed decision as to whether to submit to treatment.  Dr. Soliven based her opinion on the
following:  AStill
delusional, unkempt, poor self care, conflicted family support, no insight,
poor judgment, strong history of noncompliance.@[6]  Dr. Soliven recommended inpatient treatment Afor
further stabilization.@ 

On April
27, Becky R. Phillips, the Pecan Valley MHMR Mental Health Continuity of Care
Coordinator, filed the article 574.012 alternative treatment recommendation for
T.J.H.  She indicated that T.J.H., who
had been living in a group home in Fort Worth, had been an MHMR client in Texas
since 1990, had been diagnosed with schizophrenia, and had been hospitalized on
an emergency basis on fourteen other occasions. 
Phillips recommended that T.J.H. be hospitalized at NTSH for a period
not to exceed ninety days.








At the
May 3 hearing, Dr. Soliven testified that T.J.H. was admitted on April 15, that
T.J.H. was still her patient, that her working diagnosis of T.J.H. was Achronic
schizophrenia undifferentiated type,@ and
that T.J.H.=s last visit to NTSH before this
latest incident was in March 2010.  She
stated that T.J.H. had been to NTSH Anumerous
times.@  Dr. Soliven testified that she believed
T.J.H. was still delusional and that T.J.H. had refused her medication that
morning, continued to present an inappropriate affect (distant, unengaged),
showed poor self-cleaning and self-care, and required redirection.  She testified that T.J.H. was not showing any
insight into her mental illness and that, while T.J.H. was not actively
suicidal, Adue to her [lack of] insight and
[inability] to take care of herself, she may be.@

Dr.
Soliven testified that with regard to presenting a risk of harm to others,
T.J.H. had not been aggressive or homicidal toward others at NTSH. However, if
not treated, she warned that T.J.H. would continue to suffer severe mental,
emotional, or physical distress and continue to experience a deterioration of
her ability to function independently. 
She answered Ano,@ when
asked whether T.J.H. could make a rational and informed decision as to whether
to submit to treatment, and she recommended continued inpatient hospitalization
Awith
further adjustment of her medication and psychosocial therapy groups@ as the
proposed course of treatment and least restrictive setting for T.J.H. at this
time.[7]








T.J.H.
testified on her own behalf.  When asked
whether she was homeless prior to her current stay at NTSH, she responded, ARight.  I lived in a group home.@  She stated that she did not feel like she
might hurt herself or anyone else, and she asked to be released.  T.J.H. stated that her plan, if released, was
to return to Stephenville to live.  When
asked what she would do there, she testified,

I have business I need to take care of.  I have a bunch of paperwork I need to attend
with MHMR.  I work at the Houston
office.  I fly back and forth down there
to work, and that=s what I need to do right
now.  I need a place to live.  I=m extremely tired from staying in Dallas for two
years.

 

In response to her counsel=s
question about whether she would have any problem checking in with MHMR if she
were released, T.J.H. replied, @No, I
wouldn=t.  Every time they called me, I would be there.@

T.J.H.
denied refusing to take her medication that morning, stating, AShe=s got me
on Prozac.  She=s got me
on two different antidepressants.  I
chose the Prozac to take theCchose
the Prozac, to take the Prozac, and I dropped the InvegaC. . . to
keep me from getting so hyper.@[8]  T.J.H. testified that if released, she would
take her medicine, she would take whatever they told her to, and she felt like
she could take care of herself.

On
cross-examination, T.J.H. gave the following testimony:








Q.     [Y]ou said that if you
were released, you would continue to take your medication?

 

A.     Yes, ma=am.

 

Q.     Yet you=re already refusing to
take your medications, even while you=re in the hospital?

 

A.     I asked her for the InvegaCfor antiC

 

Q.     . . . I don=t think you understood my
question.  I said you refused to take
your medications while you were in the hospital.  Is that correct?

 

A.     No, I did not.

 

Q.     You refused to take the
Invega that she prescribed for you, didn=t you?

 

A.     I will take it.  I will.

 

Q.     But you refused to take it
this morning?

 

A.     Yes.

 

Q.     Okay.  Now, [T.J.H.], what brought you in here?

 

A.     They picked me up at my grandmother=sCgrandfather=s house
and brought me here because I was trespassing out there. They told me that I
wasn=t
allowed on the property is the reason they brought me in protective custody out
of Dallas.  And I was going to return
back to the MHMR office in Stephenville, Texas.








At the
conclusion of the May 3 hearing, the trial court stated that it found T.J.H. Amentally
ill Criteria No. 3@ and that the least restrictive
environment would be temporary commitment. 
The trial court ordered T.J.H. to be confined to NTSH as an inpatient
for a period not to exceed ninety days. 
In its judgment, after finding that T.J.H. was mentally ill, the trial
court stated that, as a result of that mental illness, T.J.H. 

will[,] if not treated[,]
continue to suffer severe and abnormal mental[,] emotional[,] or physical
distress and will continue to experience deterioration of [her] ability to
function independently[,] which is exhibited by [T.J.H.=s]
inability[,] except for reasons of indigence[,] to provide for [her] basic
needs including food[,] clothing[,] health[,] or safety; and is unable to make
a rational and informed decision as to whether or not to submit to treatment. 

See Tex.
Health & Safety Code Ann. ' 574.034(a)(1),
(2)(C)(i)B(iii), (c).  This appeal followed.

III. 
Sufficiency of the Evidence

A.  Standards of Review








The
State=s burden
of proof under section 574.034 is clear and convincing evidence.  Id. ' 574.034(a).  Clear and convincing evidence is that measure
or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.  Tex. Civ. Prac. & Rem.
Code Ann. ' 41.001(2) (Vernon 2008); Transp.
Ins. Co. v. Moriel, 879 S.W.2d 10, 31 (Tex. 1994).  This intermediate standard falls between the
preponderance standard of civil proceedings and the reasonable doubt standard
of criminal proceedings.  In re G.M.,
596 S.W.2d 846, 847 (Tex. 1980); State v. Addington, 588 S.W.2d 569, 570
(Tex. 1979).  While the proof must be of
a heavier weight than merely the greater weight of the credible evidence, there
is no requirement that the evidence be unequivocal or undisputed.  Addington, 588 S.W.2d at 570.








In
reviewing the evidence for legal sufficiency, we must determine whether the
evidence is such that a factfinder could reasonably form a firm belief or
conviction that its finding was true. 
Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue, 271 S.W.3d 238,
248 (Tex. 2008); Diamond Shamrock Ref. Co. v. Hall, 168 S.W.3d 164, 170
(Tex. 2005).  We must review all the
evidence in the light most favorable to the finding.  Hogue, 271 S.W.3d at 248;
Hall, 168 S.W.3d at 170.  This means
that we must assume that the factfinder resolved any disputed facts in favor of
its finding if a reasonable factfinder could have done so.  Hogue, 271 S.W.3d at 248; Hall,
168 S.W.3d at 170.  We must also disregard
all evidence that a reasonable factfinder could have disbelieved.  Hogue, 271 S.W.3d at 248; Hall,
168 S.W.3d at 170.  We must consider,
however, undisputed evidence even if it is contrary to the finding. Hogue,
271 S.W.3d at 248; City of Keller v. Wilson, 168 S.W.3d 802, 817 (Tex.
2005); Hall, 168 S.W.3d at 170. 
That is, we must consider evidence favorable to the finding if a
reasonable factfinder could and disregard evidence contrary to the finding
unless a reasonable factfinder could not. 
Adams v. YMCA of San Antonio, 265 S.W.3d 915, 917 (Tex. 2008); Wilson,
168 S.W.3d at 827.  The factfinder, not
this court, is the sole judge of the credibility and demeanor of the
witnesses.  In re J.O.A., 283
S.W.3d 336, 346 (Tex. 2009).

In reviewing
the evidence for factual sufficiency, we must determine whether, on the entire
record, a factfinder could reasonably form a firm conviction or belief that its
finding was true.  In re H.R.M.,
209 S.W.3d 105, 108 (Tex. 2006).  If, in
light of the entire record, the disputed evidence that a reasonable factfinder
could not have credited in favor of the finding is so significant that a
factfinder could not reasonably have formed a firm belief or conviction in the
truth of its finding, then the evidence is factually insufficient. Id.

We must
not supplant the trial court=s
judgment with our own.  Id.;
see also Barker v. Eckman, 213 S.W.3d 306, 314 (Tex. 2006).  The factfinder is the sole judge of the
credibility of witnesses and the weight to be given their testimony.  H.R.M., 209 S.W.3d at 109; Golden
Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003). 

B.  Health and Safety Code Section 574.034








Under
section 574.034(a), the trial court may order a proposed patient to receive
court‑ordered temporary inpatient mental health services only if it
finds, from clear and convincing evidence, that the proposed patient is
mentally ill and, as a result of that mental illness, the proposed patient:

(A) is
likely to cause serious harm to herself;

(B) is
likely to cause serious harm to others; 
or

(C) is:

(i) suffering severe and abnormal mental,
emotional, or physical distress;

 

(ii) experiencing substantial mental or physical
deterioration of the proposed patient=s ability to function independently, which is
exhibited by the proposed patient=s inability, except for reasons of indigence, to
provide for the proposed patient=s basic needs, including food, clothing, health,
or safety;  and

 

(iii)
unable to make a rational and informed decision as to whether or not to submit
to treatment.

Tex. Health & Safety Code
Ann. ' 574.034(a)(2).  If the factfinder finds that the proposed
patient meets the commitment criteria prescribed by subsection (a), it must
specify which criterion listed in subsection (a)(2) forms the basis for the decision.  Id. ' 574.034(c).  

C.  Analysis








T.J.H.
acknowledges, ADr. Soliven specifically
testified as to the elements of 574.034(a)(2)(C)(i) & (iii),@ but she
argues that there was insufficient evidence for the trial court to find
subsection (a)(2)(C)(ii):  that she is Aexperiencing
substantial mental or physical deterioration of [her] ability to function
independently, which is exhibited by [her] inability, except for reasons of
indigence, to provide for [her] basic needs, including food, clothing, health,
or safety.@ 
See id. ' 574.034(a)(2)(C)(ii).

T.J.H.
recites Dr. Soliven=s testimony that T.J.H. was
unkempt, unable to care for herself, and would experience a deterioration in
her ability to function independently if not treated and then argues that this
fails to establish a continuing pattern of behavior to meet the clear and
convincing evidence requirement.  See
id. ' 574.034(c),
(d)(2).  She contends that the evidence
is also insufficient to meet the clear and convincing evidence requirement for
subsection (C)(ii) because she testified that she was homeless prior to being
hospitalized and Athe impact of her indigence on
her abilities@ was not addressed.  And she complains that Dr. Soliven=s
statement that other than T.J.H.=s having
Ano
insight and not being able to take care of herself, she may be [at risk of
serious harm to herself]@ does not meet the clear and
convincing burden because it is Aonly
testimony of >possible= or >potential= harm.@








To meet
its evidentiary burden, the State had to bring forth evidence of either a
recent overt act or a continuing pattern of behavior that tends to confirm
T.J.H.=s
distress and deterioration of her ability to function.  See id. ' 574.034(d)(2).  And while the trial court could take judicial
notice of documents on file in this case, it could not take judicial notice of
the truth of any allegations contained in the documents.  See State ex rel. K.H., No.
02-02-00301-CV, 2003 WL 21404821, at *2 (Tex. App.CFort
Worth June 19, 2003, no pet.) (mem. op.). 
Therefore, we may consider only the evidence presented at the
hearing.  See id.

The
supreme court recently held that Aa
proposed patient=s words are overt acts within
the meaning of [s]ection 574.034(d)@ when
examining the Aovert act@
requirement within the context of subsection (d)(1)Cthe
likelihood of serious harm to the proposed patient or others.  K.E.W., 2010 WL 2635981, at *3B4.  K.E.W., the proposed patient at issue, had
previously been diagnosed with schizophrenia. 
Id. at *1.  On a visit to
the Gulf Coast MHMR Center where he was a patient, he stated that he wanted to
impregnate some of the center=s female
staff, in addition to some other odd behavior (acting extremely paranoid,
pacing around the building, repeatedly asking for a particular female employee,
and refusing to cooperate with police when the center staff called them).  Id. at *1, *6.  After police took K.E.W. to the emergency
room, he told treating physicians that he had been chosen to help populate a
new and better race of humans and that there was a group of women he planned to
find and impregnate, including his adult step-daughter.  Id. at *1.  He had written plans detailing his mission
and the women=s names, and he accused the
hospital staff of withholding information about the women=s
whereabouts.  Id.  








During
his commitment hearing, one of K.E.W.=s
treating psychiatrists testified that she was concerned that although K.E.W.
did not state that he intended to impregnate anyone against her will, he was Avery
intrusive and she did not know, given his state of mind, if he would understand
that >no= means >no=.@  Id. at *6.  K.E.W.=s other
treating psychiatrist opined that K.E.W.=s firm
belief in his delusion made K.E.W. a danger to the particular group of women at
issue and Aa danger to women in general
because K.E.W. might mistake any woman for one of the women he believed was
promised to him.@  Id. at *7. Unsurprisingly, the trial court
ordered temporary inpatient commitment for K.E.W.  Id. at *2.  

K.E.W.
prevailed in his appeal to the intermediate appellate court, which determined
that there was no evidence of an overt act or continuing pattern of behavior
that tended to confirm either the deterioration of K.E.W.=s
ability to function independently or that he was likely to cause serious harm
to others. See id.  However,
addressing only the sufficiency of the evidence to support the Aovert
act,@ the
Texas Supreme Court reversed this decision, concluding that the proposed
patient=s words can
be relevant both to determining whether he is mentally ill and predicting what
actions he might or will take in the future as a result of his mental
illness.  Id. at *4B5.  That is, 








a recent overt act by a proposed patient Atends to confirm@ that the patient poses a
likelihood of serious harm to others within the meaning of Section 573.034(d)
if the overt act is to some degree probative of a finding that serious harm is
probable, even though the overt act itself may not be dangerous. 

 

. . .  

 

In sum, the statute requires evidence of a recent
act by the proposed patient, either physical or verbal, that can be objectively
perceived and that is to some degree probative of a finding that serious harm
to others is probable if the person is not treated.  The overt act itself need not be of such
character that it alone would support a finding of probable serious harm to
others.

 

Id. at *5B6.  The court concluded that, while evidence of
mental illness, without more, does not fulfill the statutory requirement for
ordering involuntary inpatient mental health services, AK.E.W.=s
statements fall within the kinds of overt conduct the statute=s
language makes clear the Legislature considered relevant to a commitment
determination.@ 
Id. at *8.  That is, the
court considered probable harm and determined that the evidence was
legally sufficient to support K.E.W.=s
temporary commitment.  Id. at *6,
*8B9.








In light
of this recent case, we review the evidence to determine whether, based on the
evidence before it, the trial court could have reasonably formed a firm belief
or conviction that T.J.H. was experiencing substantial mental or physical
deterioration of her ability to function independently as exhibited by her
inability, except for reasons of indigence, to provide for her basic needs,
including food, clothing, health, or safety. 
See Tex. Health & Safety Code Ann. ' 574.034(a)(2)(C)(ii).  

We agree
with T.J.H.=s assertion that there was no
testimony about her ability to provide for her food or clothing.  And we also note that T.J.H. did not testify
that she was indigent.[9]  Therefore, we are left with determining
whether there was legally and factually sufficient evidence that T.J.H.=s
ability to provide for her health or safety was compromised.








The
trial court could have concluded from T.J.H.=s
inconsistent response about her housing situation, and from some of T.J.H.=s other
responses, that T.J.H. could not understand questions and that this showed her
deteriorating mental condition. 
Additionally, Dr. Soliven testified that she believed T.J.H. was still
delusional.  T.J.H.=s
testimony about flying back and forth to work Aat the
Houston office@ could have confirmed this for
the trial court, because the trial court could have concluded that, although
there was no testimony that T.J.H. either did or did not work at a Houston
office, T.J.H.=s testimony about working at
that office was inconsistent with her circumstances.  And in light of T.J.H.=s
admission that she had refused to take her medication, the trial court could
have concluded that Dr. Soliven=s
diagnosis that T.J.H. actually Amay be@
suicidal based on T.J.H.=s inability to take care of her
basic health and safety needs was correct.

We
conclude that, as the trial court viewed the witnesses=
demeanor and assessed their credibility during the hearing, it could have
reasonably formed a firm conviction or belief that T.J.H.=s
inability to provide for her health or safety was probable.  See K.E.W., 2010 WL 2635981, at
*6.  That is, Dr. Soliven=s and
T.J.H.=s
testimonies demonstrate that T.J.H.=s
continuing pattern of poor insight into her mental illness and poor judgment
and self-careCparticularly her noncompliance
with treatmentChas already resulted in repeated
prior hospitalizations.  From Dr. Soliven=s
testimony about how T.J.H. would continue to deteriorate without treatment and
T.J.H.=s
testimony about refusing to take her medications, the trial court could have
reasonably concluded that T.J.H.=s mental
illness had caused her to mentally deteriorate to the point that her ability to
function independently in providing for her own health and safety had been
compromised.  








In
addition to T.J.H.=s testimony about her housing,
work, and decisions about medication, she also testified that before this
hospitalization, she had been Apicked
up@ for
trespassing, allowing the trial court to reasonably conclude, in connection
with her other behavior, that T.J.H. suffered from the deterioration of her
ability to function in providing for her health and safety because of her
inability to exercise good judgment.  Cf.
In re K.P.H., Nos. 02-05-00430-CV, 02-05-00431-CV, 2006 WL 669622, at *3
(Tex. App.CFort Worth Mar. 16, 2006, no
pet.) (mem. op.) (noting that while evidence that reflects only a patient=s mental
illness and need for hospitalization is insufficient to satisfy the recent
overt act or continuing pattern standard, K.P.H.=s riding
his bicycle into traffic constituted a recent overt act that, in connection
with his other behavior, tended to confirm that he posed a safety risk to
himself and possibly others); In re K.S., No. 02-03-00295-CV, 2004 WL
254267, at *1B2 (Tex. App.CFort
Worth Feb. 12, 2004, no pet.) (mem. op.) (holding that evidence to support
temporary commitment order was legally and factually sufficient when doctor
testified that K.S. suffered from schizoaffective disorder and was likely to
cause serious harm to himself and others, and K.S.=s sister
had told the doctor that he nearly ran over her and her daughter with a car).








Like the
Aovert
act@
discussed in K.E.W., T.J.H.=s words
and actions are relevant to determining both her mental illness and the actions
she might or will take in the future as a result of her illness.  The trial court could have reasonably
concluded that T.J.H.=s testimony and demeanor at the
hearing corroborated Dr. Soliven=s
testimony about T.J.H.=s mental distress and the
deterioration of her ability to function without treatment.  That is, T.J.H.=s words
and behavior, in light of her hospitalization history, are probative of a
finding that her continued mental deterioration is probable without treatment.
And the trial court could have reasonably doubted her inconsistent assurances
that she would take her medication if released. 
See K.E.W., 2010 WL 2635981, at *6.  Therefore, although the State could have and
should have further developed the evidence concerning this factor, we conclude
that it is legally sufficient to support the trial court=s
finding.  See also Roland v. State,
989 S.W.2d 797, 802 (Tex. App.CFort
Worth 1999, no pet.) (AWe believe that Roland=s
chronic refusal to take his medication is evidence that, as a whole >tends to
confirm= the
likelihood of serious harm to Roland or others as well as the deterioration of
his ability to function.@).

Reviewing
the entire record, we conclude that the trial court could have reasonably
formed a firm conviction or belief that all of the necessary criteria were met
for the trial court to order T.J.H. to receive temporary inpatient mental
health services. That is, the trial court was the sole judge of the witnesses=
credibility and the weight to be given their testimony, and it must have chosen
to disbelieve T.J.H.=s assurances about taking her
medication and to believe Dr. Soliven with regard to T.J.H.=s
delusions and likelihood of continued mental deterioration without
treatment.  Therefore, we conclude that
the evidence is also factually sufficient. We overrule T.J.H.=s sole
issue.








IV. 
Conclusion

Having
overruled T.J.H.=s sole issue, we affirm the
trial court=s judgment.

 

 

PER
CURIAM

PANEL:  MCCOY, GARDNER, and MEIER, JJ. 

DELIVERED:  August 31, 2010

 











[1]See Tex. R. App. P. 47.4.





[2]An appeal from a
temporary involuntary commitment order does not become moot when the commitment
term expires.  State v. K.E.W, No.
09-0236, 2010 WL 2635981, at *3 (Tex. July 2, 2010) (citing State v. Lodge,
608 S.W.2d 910, 912 (Tex. 1980)). 





[3]McMilliam=s hospital consultation
notes set out the following summary before recommending that T.J.H. be ASent Involuntary@:

 

A
48 year old female evaluated for delusions and hallucinations.  She is combative and aggressive.  She is having delusions and hallucinations
that her daughter is here with her.  She
[is] uncooperative with MHMR. She has delusions that she was tortured.  Her thoughts are disorganized and [she] has a
hard time answering questions[.]  She
talks about killing people and someone trying to kill her.  She was brought up to the ER by police[;] she
had broken into a house.

 





[4]These are also the
criteria set out in health and safety code section 574.011 regarding the
findings that a certificate of medical examination for mental illness must
include, and in section 574.034 with regard to what the factfinder must find by
clear and convincing evidence for a proposed patient to receive court-ordered
temporary inpatient mental health services. 
See id. '' 574.011, .034
(Vernon 2010).





[5]T.J.H.=s additional statements
included by Dr. Jain were, AHe killed me and ate all my pants@ and AI will kill the guard.@  Dr. Jain also stated that on April 15, T.J.H.
acted as follows: Acursing, screaming[;]
unable to follow direction[;] unable to give answers and provide history[;]
responding to internal stimuli,@ and that the mental status examination revealed
the following:  Aagitated, angry,
shouting[;] mood dysphoric[;] responding to internal stimuli[;] poor insight
and judgment.@





[6]Dr. Soliven included
T.J.H.=s questions, AWhere is my daughter?@ and AIs she here?@ and descriptions (Atalking to unseen others@ and Aneeding prompting to
shower[;] walking without bra on[;] poor self care[;] alert, guarded, distant,
flat and blunted affect[,] delusional[;] no insight, poor judgment[;] no
suicidal/homicidal ideations.@





[7]Dr. Soliven added that if
T.J.H. continued to refuse her medication, Dr. Soliven might Abe pressured to go for
court-ordered meds.@  See Tex. Health & Safety Code Ann.
' 574.104 (Vernon
2010).





[8]Invega, which is the brand name of
paliperidone, Ais used to treat the symptoms of
schizophrenia (a mental illness that causes disturbed or unusual thinking, loss
of interest in life, and strong or inappropriate emotions).@ 
U.S. National Library of Medicine, National Institutes of Health, Paliperidone,  available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000356.






[9]Rather, her counsel asked
her, A[T.J.H.], now, prior to
coming into the State hospital, you were homeless, correct?@  T.J.H. gave an inconsistent answer, stating, ARight.  I lived in a group home.@