

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

NO. 2-10-149-CV

IN THE MATTER OF T.J.H.

------------

FROM COUNTY COURT AT LAW NO. 1 OF WICHITA COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

In one issue, Appellant T.J.H. challenges the legal and factual sufficiency of the evidence to support her involuntary commitment for temporary inpatient mental health services.[2]  We affirm.

------------

[1]*See* Tex. R. App. P. 47.4.

[2]An appeal from a temporary involuntary commitment order does not become moot when the commitment term expires.  *State v. K.E.W*, No. 09-0236, 2010 WL 2635981, at *3 (Tex. July 2, 2010) (citing *State v. Lodge*, 608 S.W.2d 910, 912 (Tex. 1980)).

## II. Factual and Procedural Background

All of the following documents referenced below were in the trial court's file at the time of the May 3, 2010 hearing. The trial court took judicial notice of the file's contents before the hearing began.

On April 15, 2010, at around 10:45 a.m., Pecan Valley Mental Health and Mental Retardation (MHMR) intensive case manager Damon McMilliam met with T.J.H. He noted his impressions[3] and then filed a sworn application for T.J.H.'s emergency apprehension and detention, stating that T.J.H. was delusional, having hallucinations, yelling, making threats and remarks about killing people, and cursing at staff and police. *See* Tex. Health & Safety Code Ann. § 573.011 (Vernon 2010). A magistrate immediately issued a mental health warrant for emergency detention, ordering that T.J.H. be apprehended and

---

[3]McMilliam's hospital consultation notes set out the following summary before recommending that T.J.H. be "Sent Involuntary":

A 48 year old female evaluated for delusions and hallucinations. She is combative and aggressive. She is having delusions and hallucinations that her daughter is here with her. She [is] uncooperative with MHMR. She has delusions that she was tortured. Her thoughts are disorganized and [she] has a hard time answering questions[.] She talks about killing people and someone trying to kill her. She was brought up to the ER by police[;] she had broken into a house.

2

transported to the North Texas State Hospital (NTSH) in Wichita Falls. *See id.*

§ 573.012 (Vernon 2010).

On April 16, a sworn application for temporary court-ordered mental

health services was filed, alleging that T.J.H.

> is likely to cause serious harm to others; (OR) is suffering severe
> and abnormal mental, emotional or physical distress; experiencing
> substantial mental or physical deterioration of his/her ability to
> function independently, which is exhibited by the proposed
> patient's inability, except for reasons of indigence, to provide for
> the proposed patient's needs, including food, clothing, health, or
> safety and not able to make rational and informed decisions as to
> whether to submit to treatment.[4]

*See id.* §§ 574.001–.002 (Vernon 2010). As noted on the application, T.J.H.

was not charged with any criminal offense.

The State filed a motion for an order of protective custody of T.J.H.

pending resolution of the case, and the trial court granted it. *See id.* § 574.021

(Vernon 2010). The trial court appointed an attorney to represent T.J.H., set

dates for a probable cause hearing and the application hearing, and issued

notice to T.J.H. *See id.* §§ 574.003, .005–.006, .025 (Vernon 2010). At the

---

[4]These are also the criteria set out in health and safety code section 574.011 regarding the findings that a certificate of medical examination for mental illness must include, and in section 574.034 with regard to what the factfinder must find by clear and convincing evidence for a proposed patient to receive court-ordered temporary inpatient mental health services. *See id.* §§ 574.011, .034 (Vernon 2010).

3

probable cause hearing, the hearing officer determined that there was probable cause to believe that T.J.H. presented a substantial risk of harm to others such that she could not be at liberty pending the final hearing and ordered that she continue to be detained at NTSH. *See id.* § 574.025.

The record contains two sworn certificates of medical examination for mental illness. *See id.* § 574.009 (Vernon 2010). Dr. Satyam Jain, M.D. issued the first, averring that he had examined T.J.H. on April 15 at NTSH and that he had diagnosed her with schizoaffective disorder. He stated that, as a result of her illness, T.J.H. was likely to cause serious harm to others or was suffering severe and abnormal mental, emotional, or physical distress; was experiencing substantial mental or physical deterioration of her ability to function independently, exhibited by her inability, except for reasons of indigence, to provide for her needs, including food, clothing, health, or safety; and was unable to make a rational and informed decision as to whether to submit to treatment. *See id.* § 574.011(a)(7).

Dr. Jain set out the following factual basis for his opinion: T.J.H. was "psychotic and delusional, swearing and cursing on [sic] a guard (imaginary) and wants to kill him because he killed her."[5] He stated that he believed that

---

[5]T.J.H.'s additional statements included by Dr. Jain were, "He killed me and ate all my pants" and "I will kill the guard." Dr. Jain also stated that on

4

T.J.H. presented a substantial risk of serious harm to herself or others if not immediately restrained, based on her behavior and "by evidence of severe emotional distress and deterioration in [her] mental condition to the extent that [she] cannot remain at liberty." He recommended inpatient hospitalization and noted that T.J.H. had had multiple previous psychiatric hospitalizations.

Dr. Cecile Soliven, M.D. issued the other certificate of medical examination for mental illness, stating that she evaluated T.J.H. on April 26 and diagnosed her with "chronic schizophrenia, undifferentiated." As a result of T.J.H.'s illness, Dr. Soliven found that T.J.H. was suffering severe and abnormal mental, emotional, or physical distress; was experiencing substantial mental or physical deterioration of her ability to function independently as exhibited by her inability to provide for her basic needs; and was unable to make a rational and informed decision as to whether to submit to treatment. Dr. Soliven based her opinion on the following: "Still delusional, unkempt, poor self care, conflicted family support, no insight, poor judgment, strong history

---

April 15, T.J.H. acted as follows: "cursing, screaming[;] unable to follow direction[;] unable to give answers and provide history[;] responding to internal stimuli," and that the mental status examination revealed the following: "agitated, angry, shouting[;] mood dysphoric[;] responding to internal stimuli[;] poor insight and judgment."

5

of noncompliance."[6]  Dr. Soliven recommended inpatient treatment "for further stabilization."

On April 27, Becky R. Phillips, the Pecan Valley MHMR Mental Health Continuity of Care Coordinator, filed the article 574.012 alternative treatment recommendation for T.J.H.  She indicated that T.J.H., who had been living in a group home in Fort Worth, had been an MHMR client in Texas since 1990, had been diagnosed with schizophrenia, and had been hospitalized on an emergency basis on fourteen other occasions.  Phillips recommended that T.J.H. be hospitalized at NTSH for a period not to exceed ninety days.

At the May 3 hearing, Dr. Soliven testified that T.J.H. was admitted on April 15, that T.J.H. was still her patient, that her working diagnosis of T.J.H. was "chronic schizophrenia undifferentiated type," and that T.J.H.'s last visit to NTSH before this latest incident was in March 2010.  She stated that T.J.H. had been to NTSH "numerous times."  Dr. Soliven testified that she believed T.J.H. was still delusional and that T.J.H. had refused her medication that morning, continued to present an inappropriate affect (distant, unengaged),

[6]Dr. Soliven included T.J.H.'s questions, "Where is my daughter?" and "Is she here?" and descriptions ("talking to unseen others" and "needing prompting to shower[;] walking without bra on[;] poor self care[;] alert, guarded, distant, flat and blunted affect[,] delusional[;] no insight, poor judgment[;] no suicidal/homicidal ideations."

showed poor self-cleaning and self-care, and required redirection. She testified that T.J.H. was not showing any insight into her mental illness and that, while T.J.H. was not actively suicidal, "due to her [lack of] insight and [inability] to take care of herself, she may be."

Dr. Soliven testified that with regard to presenting a risk of harm to others, T.J.H. had not been aggressive or homicidal toward others at NTSH. However, if not treated, she warned that T.J.H. would continue to suffer severe mental, emotional, or physical distress and continue to experience a deterioration of her ability to function independently. She answered "no," when asked whether T.J.H. could make a rational and informed decision as to whether to submit to treatment, and she recommended continued inpatient hospitalization "with further adjustment of her medication and psychosocial therapy groups" as the proposed course of treatment and least restrictive setting for T.J.H. at this time.[7]

T.J.H. testified on her own behalf. When asked whether she was homeless prior to her current stay at NTSH, she responded, "Right. I lived in a group home." She stated that she did not feel like she might hurt herself or

---

[7]Dr. Soliven added that if T.J.H. continued to refuse her medication, Dr. Soliven might "be pressured to go for court-ordered meds." *See* Tex. Health & Safety Code Ann. § 574.104 (Vernon 2010).

anyone else, and she asked to be released. T.J.H. stated that her plan, if released, was to return to Stephenville to live. When asked what she would do there, she testified,

> I have business I need to take care of. I have a bunch of paperwork I need to attend with MHMR. I work at the Houston office. I fly back and forth down there to work, and that's what I need to do right now. I need a place to live. I'm extremely tired from staying in Dallas for two years.

In response to her counsel's question about whether she would have any problem checking in with MHMR if she were released, T.J.H. replied, "No, I wouldn't. Every time they called me, I would be there."

T.J.H. denied refusing to take her medication that morning, stating, "She's got me on Prozac. She's got me on two different antidepressants. I chose the Prozac to take the—chose the Prozac, to take the Prozac, and I dropped the Invega—. . . to keep me from getting so hyper."[8] T.J.H. testified that if released, she would take her medicine, she would take whatever they told her to, and she felt like she could take care of herself.

On cross-examination, T.J.H. gave the following testimony:

---

[8]Invega, which is the brand name of paliperidone, "is used to treat the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions)." U.S. National Library of Medicine, National Institutes of Health, *Paliperidone*, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000356.

8

Q. [Y]ou said that if you were released, you would continue to take your medication?

A. Yes, ma'am.

Q. Yet you're already refusing to take your medications, even while you're in the hospital?

A. I asked her for the Invega—for anti—

Q. . . . I don't think you understood my question. I said you refused to take your medications while you were in the hospital. Is that correct?

A. No, I did not.

Q. You refused to take the Invega that she prescribed for you, didn't you?

A. I will take it. I will.

Q. But you refused to take it this morning?

A. Yes.

Q. Okay. Now, [T.J.H.], what brought you in here?

A. They picked me up at my grandmother's—grandfather's house and brought me here because I was trespassing out there. They told me that I wasn't allowed on the property is the reason they brought me in protective custody out of Dallas. And I was going to return back to the MHMR office in Stephenville, Texas.

At the conclusion of the May 3 hearing, the trial court stated that it found T.J.H. "mentally ill Criteria No. 3" and that the least restrictive environment would be temporary commitment. The trial court ordered T.J.H. to be confined

9

to NTSH as an inpatient for a period not to exceed ninety days. In its judgment, after finding that T.J.H. was mentally ill, the trial court stated that, as a result of that mental illness, T.J.H.

> will[,] if not treated[,] continue to suffer severe and abnormal mental[,] emotional[,] or physical distress and will continue to experience deterioration of [her] ability to function independently[,] which is exhibited by [T.J.H.'s] inability[,] except for reasons of indigence[,] to provide for [her] basic needs including food[,] clothing[,] health[,] or safety; and is unable to make a rational and informed decision as to whether or not to submit to treatment.

*See* Tex. Health & Safety Code Ann. § 574.034(a)(1), (2)(C)(i)–(iii), (c). This appeal followed.

## III. Sufficiency of the Evidence

### A. Standards of Review

The State's burden of proof under section 574.034 is clear and convincing evidence. *Id.* § 574.034(a). Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. Tex. Civ. Prac. & Rem. Code Ann. § 41.001(2) (Vernon 2008); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex. 1994). This intermediate standard falls between the preponderance standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).

10

While the proof must be of a heavier weight than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570.

In reviewing the evidence for legal sufficiency, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true. *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008); *Diamond Shamrock Ref. Co. v. Hall*, 168 S.W.3d 164, 170 (Tex. 2005). We must review all the evidence in the light most favorable to the finding. *Hogue*, 271 S.W.3d at 248; *Hall*, 168 S.W.3d at 170. This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Hogue*, 271 S.W.3d at 248; *Hall*, 168 S.W.3d at 170. We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Hogue*, 271 S.W.3d at 248; *Hall*, 168 S.W.3d at 170. We must consider, however, undisputed evidence even if it is contrary to the finding. *Hogue*, 271 S.W.3d at 248; *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005); *Hall*, 168 S.W.3d at 170. That is, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 917 (Tex. 2008); *Wilson*, 168

11

S.W.3d at 827. The factfinder, not this court, is the sole judge of the credibility and demeanor of the witnesses. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

In reviewing the evidence for factual sufficiency, we must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that its finding was true. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *Id.*

We must not supplant the trial court's judgment with our own. *Id.*; *see also Barker v. Eckman*, 213 S.W.3d 306, 314 (Tex. 2006). The factfinder is the sole judge of the credibility of witnesses and the weight to be given their testimony. *H.R.M.*, 209 S.W.3d at 109; *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

B. Health and Safety Code Section 574.034

Under section 574.034(a), the trial court may order a proposed patient to receive court-ordered temporary inpatient mental health services only if it

finds, from clear and convincing evidence, that the proposed patient is mentally ill and, as a result of that mental illness, the proposed patient:

    (A) is likely to cause serious harm to herself;

    (B) is likely to cause serious harm to others;  or

    (C) is:

        (i) suffering severe and abnormal mental, emotional, or physical distress;

        (ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety;  and

        (iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

Tex. Health & Safety Code Ann. § 574.034(a)(2).  If the factfinder finds that the proposed patient meets the commitment criteria prescribed by subsection (a), it must specify which criterion listed in subsection (a)(2) forms the basis for the decision.  *Id.* § 574.034(c).

C.  Analysis

    T.J.H. acknowledges, "Dr. Soliven specifically testified as to the elements of 574.034(a)(2)(C)(i) & (iii)," but she argues that there was insufficient evidence for the trial court to find subsection (a)(2)(C)(ii):  that she is "experiencing substantial mental or physical deterioration of [her] ability to

13

function independently, which is exhibited by [her] inability, except for reasons of indigence, to provide for [her] basic needs, including food, clothing, health, or safety." *See id.* § 574.034(a)(2)(C)(ii).

T.J.H. recites Dr. Soliven's testimony that T.J.H. was unkempt, unable to care for herself, and would experience a deterioration in her ability to function independently if not treated and then argues that this fails to establish a continuing pattern of behavior to meet the clear and convincing evidence requirement. *See id.* § 574.034(c), (d)(2). She contends that the evidence is also insufficient to meet the clear and convincing evidence requirement for subsection (C)(ii) because she testified that she was homeless prior to being hospitalized and "the impact of her indigence on her abilities" was not addressed. And she complains that Dr. Soliven's statement that other than T.J.H.'s having "no insight and not being able to take care of herself, she may be [at risk of serious harm to herself]" does not meet the clear and convincing burden because it is "only testimony of 'possible' or 'potential' harm."

To meet its evidentiary burden, the State had to bring forth evidence of either a recent overt act or a continuing pattern of behavior that tends to confirm T.J.H.'s distress and deterioration of her ability to function. *See id.* § 574.034(d)(2). And while the trial court could take judicial notice of documents on file in this case, it could not take judicial notice of the truth of

14

any allegations contained in the documents. *See State ex rel. K.H.*, No. 02-02-00301-CV, 2003 WL 21404821, at *2 (Tex. App.—Fort Worth June 19, 2003, no pet.) (mem. op.). Therefore, we may consider only the evidence presented at the hearing. *See id.*

The supreme court recently held that "a proposed patient's words are overt acts within the meaning of [s]ection 574.034(d)" when examining the "overt act" requirement within the context of subsection (d)(1)—the likelihood of serious harm to the proposed patient or others. *K.E.W.*, 2010 WL 2635981, at *3–4. K.E.W., the proposed patient at issue, had previously been diagnosed with schizophrenia. *Id.* at *1. On a visit to the Gulf Coast MHMR Center where he was a patient, he stated that he wanted to impregnate some of the center's female staff, in addition to some other odd behavior (acting extremely paranoid, pacing around the building, repeatedly asking for a particular female employee, and refusing to cooperate with police when the center staff called them). *Id.* at *1, *6. After police took K.E.W. to the emergency room, he told treating physicians that he had been chosen to help populate a new and better race of humans and that there was a group of women he planned to find and impregnate, including his adult step-daughter. *Id.* at *1. He had written plans detailing his mission and the women's names, and he accused the hospital staff of withholding information about the women's whereabouts. *Id.*

15

During his commitment hearing, one of K.E.W.'s treating psychiatrists testified that she was concerned that although K.E.W. did not state that he intended to impregnate anyone against her will, he was "very intrusive and she did not know, given his state of mind, if he would understand that 'no' means 'no'." *Id.* at \*6. K.E.W.'s other treating psychiatrist opined that K.E.W.'s firm belief in his delusion made K.E.W. a danger to the particular group of women at issue and "a danger to women in general because K.E.W. might mistake any woman for one of the women he believed was promised to him." *Id.* at \*7. Unsurprisingly, the trial court ordered temporary inpatient commitment for K.E.W. *Id.* at \*2.

K.E.W. prevailed in his appeal to the intermediate appellate court, which determined that there was no evidence of an overt act or continuing pattern of behavior that tended to confirm either the deterioration of K.E.W.'s ability to function independently or that he was likely to cause serious harm to others. *See id.* However, addressing only the sufficiency of the evidence to support the "overt act," the Texas Supreme Court reversed this decision, concluding that the proposed patient's words can be relevant both to determining whether he is mentally ill and predicting what actions he might or will take in the future as a result of his mental illness. *Id.* at \*4–5. That is,

16

a recent overt act by a proposed patient "tends to confirm" that the patient poses a likelihood of serious harm to others within the meaning of Section 573.034(d) if the overt act is to some degree probative of a finding that serious harm is probable, even though the overt act itself may not be dangerous.

. . .

In sum, the statute requires evidence of a recent act by the proposed patient, either physical or verbal, that can be objectively perceived and that is to some degree probative of a finding that serious harm to others is probable if the person is not treated. The overt act itself need not be of such character that it alone would support a finding of probable serious harm to others.

*Id.* at *5–6. The court concluded that, while evidence of mental illness, without more, does not fulfill the statutory requirement for ordering involuntary inpatient mental health services, "K.E.W.'s statements fall within the kinds of overt conduct the statute's language makes clear the Legislature considered relevant to a commitment determination." *Id.* at *8. That is, the court considered *probable* harm and determined that the evidence was legally sufficient to support K.E.W.'s temporary commitment. *Id.* at *6, *8–9.

In light of this recent case, we review the evidence to determine whether, based on the evidence before it, the trial court could have reasonably formed a firm belief or conviction that T.J.H. was experiencing substantial mental or physical deterioration of her ability to function independently as exhibited by her inability, except for reasons of indigence, to provide for her basic needs,

17

including food, clothing, health, or safety. *See* Tex. Health & Safety Code Ann. § 574.034(a)(2)(C)(ii).

We agree with T.J.H.'s assertion that there was no testimony about her ability to provide for her food or clothing. And we also note that T.J.H. did not testify that she was indigent.[9] Therefore, we are left with determining whether there was legally and factually sufficient evidence that T.J.H.'s ability to provide for her health or safety was compromised.

The trial court could have concluded from T.J.H.'s inconsistent response about her housing situation, and from some of T.J.H.'s other responses, that T.J.H. could not understand questions and that this showed her deteriorating mental condition. Additionally, Dr. Soliven testified that she believed T.J.H. was still delusional. T.J.H.'s testimony about flying back and forth to work "at the Houston office" could have confirmed this for the trial court, because the trial court could have concluded that, although there was no testimony that T.J.H. either did or did not work at a Houston office, T.J.H.'s testimony about working at that office was inconsistent with her circumstances. And in light of T.J.H.'s admission that she had refused to take her medication, the trial

---

[9]Rather, her counsel asked her, "[T.J.H.], now, prior to coming into the State hospital, you were homeless, correct?" T.J.H. gave an inconsistent answer, stating, "Right. I lived in a group home."

18

court could have concluded that Dr. Soliven's diagnosis that T.J.H. actually "may be" suicidal based on T.J.H.'s inability to take care of her basic health and safety needs was correct.

We conclude that, as the trial court viewed the witnesses' demeanor and assessed their credibility during the hearing, it could have reasonably formed a firm conviction or belief that T.J.H.'s inability to provide for her health or safety was probable. *See K.E.W.*, 2010 WL 2635981, at *6. That is, Dr. Soliven's and T.J.H.'s testimonies demonstrate that T.J.H.'s continuing pattern of poor insight into her mental illness and poor judgment and self-care—particularly her noncompliance with treatment—has already resulted in repeated prior hospitalizations. From Dr. Soliven's testimony about how T.J.H. would continue to deteriorate without treatment and T.J.H.'s testimony about refusing to take her medications, the trial court could have reasonably concluded that T.J.H.'s mental illness had caused her to mentally deteriorate to the point that her ability to function independently in providing for her own health and safety had been compromised.

In addition to T.J.H.'s testimony about her housing, work, and decisions about medication, she also testified that before this hospitalization, she had been "picked up" for trespassing, allowing the trial court to reasonably conclude, in connection with her other behavior, that T.J.H. suffered from the

19

deterioration of her ability to function in providing for her health and safety because of her inability to exercise good judgment. *Cf. In re K.P.H.*, Nos. 02-05-00430-CV, 02-05-00431-CV, 2006 WL 669622, at *3 (Tex. App.—Fort Worth Mar. 16, 2006, no pet.) (mem. op.) (noting that while evidence that reflects only a patient's mental illness and need for hospitalization is insufficient to satisfy the recent overt act or continuing pattern standard, K.P.H.'s riding his bicycle into traffic constituted a recent overt act that, in connection with his other behavior, tended to confirm that he posed a safety risk to himself and possibly others); *In re K.S.*, No. 02-03-00295-CV, 2004 WL 254267, at *1–2 (Tex. App.—Fort Worth Feb. 12, 2004, no pet.) (mem. op.) (holding that evidence to support temporary commitment order was legally and factually sufficient when doctor testified that K.S. suffered from schizoaffective disorder and was likely to cause serious harm to himself and others, and K.S.'s sister had told the doctor that he nearly ran over her and her daughter with a car).

Like the "overt act" discussed in *K.E.W.*, T.J.H.'s words and actions are relevant to determining both her mental illness and the actions she might or will take in the future as a result of her illness. The trial court could have reasonably concluded that T.J.H.'s testimony and demeanor at the hearing corroborated Dr. Soliven's testimony about T.J.H.'s mental distress and the deterioration of her ability to function without treatment. That is, T.J.H.'s

20

words and behavior, in light of her hospitalization history, are probative of a finding that her continued mental deterioration is probable without treatment. And the trial court could have reasonably doubted her inconsistent assurances that she would take her medication if released. *See K.E.W.*, 2010 WL 2635981, at *6. Therefore, although the State could have and should have further developed the evidence concerning this factor, we conclude that it is legally sufficient to support the trial court's finding. *See also Roland v. State*, 989 S.W.2d 797, 802 (Tex. App.—Fort Worth 1999, no pet.) ("We believe that Roland's chronic refusal to take his medication is evidence that, as a whole 'tends to confirm' the likelihood of serious harm to Roland or others as well as the deterioration of his ability to function.").

Reviewing the entire record, we conclude that the trial court could have reasonably formed a firm conviction or belief that all of the necessary criteria were met for the trial court to order T.J.H. to receive temporary inpatient mental health services. That is, the trial court was the sole judge of the witnesses' credibility and the weight to be given their testimony, and it must have chosen to disbelieve T.J.H.'s assurances about taking her medication and to believe Dr. Soliven with regard to T.J.H.'s delusions and likelihood of continued mental deterioration without treatment. Therefore, we conclude that the evidence is also factually sufficient. We overrule T.J.H.'s sole issue.

21

## IV.  Conclusion

Having overruled T.J.H.'s sole issue, we affirm the trial court's judgment.

PER CURIAM

PANEL:  MCCOY, GARDNER, and MEIER, JJ.

DELIVERED:  August 31, 2010